# EXHIBIT 2

# Public Access to Court Information - Case Search

**Case Information**

| Case Number: | P-1300-CV-201000235 | | |
|---|---|---|---|
| Title: | ANDREA MARKS PLAINTIFFvs | Category: | Civil |
| Court: | Yavapai County Superior | Filing Date: | 02/10/2010 |
| Judge: | UNKNOWN | Disposition Date: | |

**BANK OF AMERICA**   DEFENDANT  -  D 1

**FEDERAL NATIONAL MORTGAGE ASSOCIATION**   DEFENDANT  -  D 2

**SHAW GIL**   ATTORNEY  -  Y 1

**ANDREA MARKS**   PLAINTIFF  -  P 1

**Case Activity**

| Date | Description | Party |
|---|---|---|
| 02/19/2010 | ORDER: TEMPORARY RESTRAINING ORDER | P 1 |
| 02/19/2010 | ORDER: SHOW CAUSE | D 1 |
| 02/18/2010 | MOTION: Motion | P 1 |
| 02/18/2010 | ORDER: Denying | P 1 |
| 02/12/2010 | COMPLAINT: AMENDED COMPLAINT | P 1 |
| 02/11/2010 | MOTION: Motion | P 1 |
| 02/11/2010 | MOTION: TEMPORARY ORDERS | P 1 |
| 02/10/2010 | COMPLAINT: Complaint | P 1 |
| 02/10/2010 | SUMMONS: SUMMONS | P 1 |
| 02/10/2010 | ARBITRATION: Certificate of Compulsory Arbitration | P 1 |

**NOTES:**
**Maricopa Superior Court Criminal Case data is temporarily unavailable. There is currently no time estimate for when this data will be available.**
**The following case types are excluded from search results:** sealed cases, cases involving un-served Orders of Protection, mental health and probate cases, victim and witness data. Juvenile incorrigible/delinquency case information also cannot be viewed on this website; however other types of cases in which juveniles are parties, such as traffic cases, may be displayed. Certain administrative functions carried out by superior court clerk's offices in each county are not included in this website, such as passport application processing and private process server registration.

**Please be aware of the following limitations of the case records displayed:**
• The information may not be a current, accurate, or complete record of the case.
• The information is subject to change at any time.
• The information is not the official record of the court.
• Not all cases from a participating court may be included.
• The information should not be used as a substitute for a thorough background search of official public records.

**The user is responsible for verifying information provided on this website against official court information filed at the court of record.** Use of this website shall indicate agreement by the user that the Arizona judiciary, including its courts, divisions, officers, and employees, shall not be liable for any loss, consequence, or damage resulting directly or indirectly from the use of any of the information available through this website and that the Arizona judiciary does not provide any warranty, express or implied, that the information provided is accurate, current, correct, or complete.

Data available on this web site is updated frequently and can be provided via electronic media for an annual subscription fee. If interested, please Contact Us.

**Case info is updated on this website weekly. Information is updated each Wednesday to reflect case information through the preceding week.**

FILED

_____ O'Clock, _____ M

FEB 1 9 2010

JEANNE HICKS, Clerk
BY _____ SHETAL PATEL
Deputy

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR YAVAPAI COUNTY

| | |
|---|---|
| ANDREA MARKS, a single woman, Plaintiff, Vs. BANK OF AMERICA a foreign corporation, FEDERAL NATIONAL MORTGAGE ASSOCIATION dba Fannie Mae, a Federally Chartered Corporation, BLACK CORPORATIONS 1-5, WHITE PARTNERSHIPS 1-5, JOHN DOES 1-5 AND JANE DOES 1-5, Defendants. | Case No. P1300 CV 2010 00233<br><br>TEMPORARY RESTRAINING ORDER<br><br>(WITH NOTICE) |

The Court having considered the Motion for an Expedited Temporary Restraining Order WITH NOTICE and Preliminary Injunction finds as follows:

1. That Plaintiffs STANDS TO suffer irreparable harm IF the requested relief is not granted;

2. That Plaintiffs have no other remedy for relief except injunctive relief;

3. That Plaintiffs ~~have committed no misconduct and have~~ HAS not unreasonably delayed;

4. That the relative hardship favors the Plaintiffs;

5. ~~That the public would be served by requiring Defendants to follow the Program Guidelines.~~

Therefore,

IT IS HEREBY ORDERED that the Defendants shall suspend eviction proceedings until a hearing can be held in this matter.

Dated this 19th day of February, 2010 AT 9:48

_____
Judge of the Superior Court

\* PROOF OF SERVICE OF DOCUMENTS PROVIDED TO THE COURT ON 2-19-10 AT 9:42 AM. WITH FED SCHEDULED IN DIVISION 1 AT 11:30

FEB 1 9 2010

**GIL SHAW**
**Attorney & Counselor at Law**
105 South Cortez
Second Floor
Prescott, Arizona 86303
928-443-9600
gshaw@peoplesrightslaw.com

10 **FILED** A
___ O'Clock, ___ M
FEB 1 9 2010
JEANNE HICKS, Clerk
BY ___ SHEETAL PATEL
Deputy

Gil Shaw, SBN 009290
Attorney for Plaintiffs

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR YAVAPAI COUNTY

| | |
|---|---|
| ANDREA MARKS, a single woman,<br>Plaintiff,<br>Vs.<br>BANK OF AMERICA  a foreign corporation, FEDERAL NATIONAL MORTGAGE ASSOCIATION dba Fannie Mae, a Federally Chartered Corporation,BLACK CORPORATIONS 1-5, WHITE PARTNERSHIPS 1-5, JOHN DOES 1-5 AND JANE DOES 1-5, Defendants. | Case No. P1300 CV2010-00235<br><br><br><br>ORDER TO SHOW CAUSE |

The Court having considered the Plaintiffs' **RENEWED** MOTION FOR AN

EXPEDITED  TEMPORARY RESTRAINING ORDER AND

PRELIMINARY INJUNCTION with notice, and the accompanying Memorandum of

Points and Authorities, Plaintiff's Declaration and Plaintiffs' Verified Complaint in this

action, and good cause appearing,

IT IS HEREBY ORDERED that Defendants Bank of America, and Federal

National Mortgage Association, appear before this Court on the 26 th day of

February, 2010 at 3:00, P.m. in Courtroom 204 of the Yavapai

County Courthouse, 120 South Cortez, Prescott, Arizona to show cause, if any there be,

( ✓ Plts/Atty  G. Shaw  ) Arb w/file

( ) Deft/Atty ___ TOTAL ___

( ) ___ ( ) Arbiter

FEB 1 9 2010

why a Preliminary Injunction should not be issued as requested in the Plaintiffs' Verified

Complaint in this action. Time allotted is _90_ minutes.

IT IS FURTHER ORDERED that a copy of this Order to Show Cause be served

together with the Summons and Complaint, on Defendants Bank of America, and Federal

National Mortgage Association, as required by the applicable Rules of Civil Procedure.

Dated this _19th_ day of _February_, 2010.

Judge of the Superior Court

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 85303
928-443-9600

-2-

DAY OF
JEANNE HICKS
Clerk Superior Court
By _____ Heather Figueroa
Deputy
FEB 18 2010

**GIL SHAW**

**Attorney & Counselor at Law**

105 South Cortez

Second Floor

Prescott, Arizona 86303

928-443-9600

gshaw@peoplesrightslaw.com

Gil Shaw, SBN 009290
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR YAVAPAI COUNTY

| | |
|---|---|
| ANDREA MARKS, a single woman, Plaintiff, Vs. BANK OF AMERICA a foreign corporation, FEDERAL NATIONAL MORTGAGE ASSOCIATION dba Fannie Mae, a Federally Chartered Corporation,BLACK CORPORATIONS 1-5, WHITE PARTNERSHIPS 1-5, JOHN DOES 1-5 AND JANE DOES 1-5, Bank of Americas | Case No. CV P1300 CV2010-00235 **RENEWED** MOTION FOR AN EXPEDITED TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION **WITH NOTICE** (Emergency Restraining Order Requested) |

Plaintiff, Andrea Marks, by and through undersigned counsel and pursuant to Arizona Rule of Civil Procedure 65, request the Court to issue, on an expedited basis, a temporary restraining order and subsequently grant a preliminary injunction enjoining Bank of Americas from further proceedings consistent with any foreclosure proceeding that have occurred relating to the Plaintiff's real property. This Motion is more fully supported by the following Memorandum of Points and Authorities, the Verified Complaint filed in this action and the Affidavit of Andrea Marks. [1]

---

[1] A previous version of this motion was filed on February 8th, 2010. In a M/E dated February 18th, this court denied the motion because there was no indication that the requested TRO was for a hearing with or without notice. Counsel for Plaintiff unfortunately presumed that since there was no specific request in the moving papers for a hearing without notice

## Memorandum of Points and Authorities

### Factual Basis for Injunctive Relief

### A. The Plaintiff seek loan modification assistance in August of 2009 and is given verbal approval on October 2nd 2009 and is assured that paperwork is soon to follow.

Plaintiff is a single woman, owning as her sole and separate property, real property and home located at 5267 North Stetson, Prescott Valley, Arizona. (Property)[2] Plaintiff hired a mortgage modification assistance firm on August 17th, 2009 New York Financial, to assist her in submitting an application for homeowner assistance to Bank of America requesting modification of her loan. [3]

Plaintiff Marks application was submitted and she was told on October 2nd, 2009 that she had indeed qualified for assistance and modification of her loan with a reduction by almost one half of her mortgage payment. [4]

Marks asked if she could have a day or so to consider the terms. She called Bank of America on October 3rd, 2009, to accept the offer and request the paperwork. [5] Bank of America attempted to take a payment that day pursuant to the loan modification, but was unable to process it. Marks was prepared to make a payment, but was told that she could send her first payment in with the signed loan modification documents that would be forthcoming within the next two weeks. [6]

### B. Waiting for the paper work - waiting for Godot.

---

nor was there an accompanying affidavit setting for the reasons it should be heard without notice, that the court would have set it for hearing in due course allowing the Defendants to be provided with the pleadings, and the specific Order to Show Cause. There exists no requirement that a party be given an opportunity to argue against the issuance of the OSC. ARCP Rule 6(d) merely requires the existence of a verified complaint or other sworn testimony for a court to issue an order to show cause to the adverse party.

[2] Declaration of Andrea Marks, ¶1(Exhibit A)
[3] Id ¶2
[4] Id ¶3
[5] Id ¶4
[6] Id ¶4

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-445-9600

Marks has been waiting for documents in excess of *four months* since the original notification on October 3rd, 2009 that she had indeed qualified. Two weeks after the October 3rd notification, Marks called and was told it could be a bit longer. However, by the end of October no paper work or agreements had been sent for her signature or approval [7]

After being told in a November 1st, 2009 call by Bank of America that it had "45 days" to get the paper work out, Marks waited until November 15th to inquire yet again about the lack of documents. After spending over three hours on the phone, she was assured that the loan modification paperwork would be on its way. In addition, she was told that the foreclosure had been "pushed back" and that the delay seemed to be some sort of a "bank error" that would be corrected. [8]

For the next 45 days, Marks waited for documents and communication from Bank of America. An attempt to contact the bank prior to Christmas met with extended hold times and no communication with any bank representative[9].

**C. Bank of America then foreclosed on Plaintiff's home and eviction proceedings are imminent.**

On January 14th, 2010, Marks was informed that the foreclosure proceedings she assumed were on hold, apparently were not. A gentleman personally notified her that a foreclosure had occurred and that she could expect eviction proceedings to follow. [10]

Unless injunctive relief is immediately granted, Plaintiff will suffer immediate, irreparable harm. She has received notice that eviction proceeding are soon to be filed.[11] Her office is run out of her home. She is an insurance broker who will suffer severe consequences if the foreclosure is not set aside. Relocation and moving will result in a

---

[7] Id ¶¶4,5
[8] Id ¶¶6,7
[9] Id ¶¶8,9
[10] Id ¶10
[11] Id ¶15

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
103 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-445-0600

1   substantial expense. She has to "self report" the foreclosure and it will result in the

2   destruction of her broker relationships.[12] The lender, however, bears no hardship as there

3   are financial incentives paid by the Program for participating in the Program and

4   suspending foreclosure while the application is considered.  There is a strong likelihood

5   that Plaintiff will succeed on the merits of her case as the Guidelines for the Program are

6   clearly set forth, the Plaintiff has met all requirements of the Program, and yet Bank of

7   America refuses to follow the Guidelines set forth for lender participants in the Program.[13]

8

9                          Legal Authority and Arguments

10   I.   The Home Assistance Mortgage Program is designed to assist homeowners,

11         not drive them mad with frustration to the point of giving up.

12         A.   HAMP requires any foreclosure proceedings to be suspended during the

13               application process and or any subsequent trial period of loan modification.

14               Bank of America has ignored this mandate:

15   The U.S. Treasury Department has set out specific guidelines that any financial

16   institution must follow in order to be eligible for government subsidies of loan

17   modification efforts. Those guidelines require that:

18                        Any foreclosure action will be temporarily
                          suspended during  the trial period, or while borrowers
19                        are considered for alternative foreclosure prevention
                          options. [14]
20

21   Once Marks submitted her application for assistance she began seeking "alternative

22   foreclosure options" that required the foreclosure or trustee sale proceedings to be

23   suspended.  Bank of America has acknowledged this duty to suspend the foreclosure as

24   bank representatives repeatedly assured Marks that the foreclosure proceedings had been

25   _____
     [12] Id.¶¶13,14
26   [13] Id¶ 11
     [14] Treasury Guidelines, page 3, Exhibit B attached hereto.

                                          -4-

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

1    "pushed back" or postponed on several occasions. [15]

2         Yet, despite receiving word that she had been approved for a modification and

3    would thus move into the "trial period," a foreclosure occurred.  Despite being told the

4    foreclosure proceeding had been "pushed back," the foreclosure occurred.  And despite

5    the fact that Marks never received any notification beyond the oral communication that

6    she had been accepted, the foreclosure occurred.

7         Once Marks made inquiries and submitted information regarding modification,

8    Bank of America was *required*  to screen her situation and see if she would qualify for

9    assistance.[16]  Bank of America apparently did so, found Marks qualified, but continued

10   with the foreclosure nonetheless.  There would be virtually no incentive for a homeowner

11   to submit to this process if it would allow a bank to do what Bank of America did to

12   Marks.  She is sitting on a stick of dynamite.  The fuse was lit.  Bank of America told her it

13   put the fuse out, yet it kept burning and without warning the foreclosure exploded in her

14   face.

15        B.  <u>HAMP should truly assist homeowners , not lull them into a false sense of</u>

16            <u>security to only take away their homes.</u>

17        The HAMP program is so new that little case law exists.  A federal district court

18   case out of Minnesota, that while instructive in many respects, is not on all points with the

19   facts of this case.[17]  However, *Williams* provides a detailed description of how the HAMP

20   process is supposed to function from application through any offered loan modification.

21              HAMP is aimed to financially assist three to four
             million homeowners who have defaulted on their
22           mortgages or who are in imminent risk of default by
             reducing monthly payments to sustainable levels.
23           Bowman Aff., [Docket No. 9], Ex. B at 1 (Treasury
             Supplemental Directive 09-01 describing the HAMP
24

25   [15] Declaration of Andrea Marks, ¶¶6,7
     [16] Treasury Guidelines, page 5.
26   [17] *Williams v Giether et al*, 2009 WL 3757380 (Fed.D.Minn. 2009) [WestLaw copy attached hereto]

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

and eligibility requirements, hereinafter referred to as "SD 09-01"). The HAMP works by providing financial incentives to participating mortgage servicers to modify the terms of eligible loans. *See* Maggiano Decl. [Docket No. 83] ¶ 16. Treasury provides guidance to servicers by defining the class of borrowers who are eligible for a loan modification and setting forth specific modification protocols.[18]

*Williams* sought a finding **after** a loan modification was denied that there was a property right to a loan modification under the law. The class of Plaintiffs then argued that once a property right was established then procedural due process protections must apply.[19]  While that law states that there "shall be consent, where appropriate..." the federal district court found there was no intent on the part of Congress to "create a property interest in loan modifications ...[or] an absolute duty ...to consent to a loan modification." [20]  While noting that the Congress did not intend to mandate loan modifications, the court evidently <u>saw the intent was clear to have the process of modification occur.</u>  The court pointed out the Treasury *requires* the loan servicers to provide adequate reasons for a loan modification denial and to furnish the Treasury and Fannie May with that specific reason for denial.[21]

As a predicate to any final foreclosure, HAMP thus requires the lending institution to document the reason for any loan denial.  Marks was never provided *anything* from Bank of America except verbal assurance she had been **approved** for modification.  Logic would then dictate that the bank must either provide the documents to consummate the modification or justify in writing the reasons why modification would not be appropriate. Marks has been left in a twilight zone of an approval never documented, or a change of

---

[18] Id at page 3
[19] Id at page 6
[20] Id at page 7
[21] Id at page 5

heart and a disapproval, also never documented. Bank of America must do one of two things: provide documents to modify the loan, or provide written reasons as to why its first inclination was wrong. The process to determine eligibility is not discretionary. It must occur. The process, if one could call it that, was all but junked and thrown out the window for Marks.

**II. Injunctive Relief is appropriate. Marks will demonstrate the likelihood she will prevail as Bank of America has utterly failed to handle her loan in accordance with the HAMP program.**

    A.   <u>Marks will meet all the tests required for injunctive relief. She is fighting for her home, has done nothing wrong and can demonstrate the importance of having the HAMP program administered in accordance with law.</u>

Superior Court Judges have the authority to grant injunctive relief in any case in which a party is entitled to injunction under the principles of equity. A.R.S. § 12-1801. In order to grant a request for preliminary injunction, the plaintiffs must establish 1) that the balance of hardship favors them, 2) the strong likelihood of their success on the merits, and 3) the possibility of irreparable harm if relief is not granted. *Power P.E.O., Inc. v. Employees Ins. of Wausau,* 201 Ariz. 559, 562, 38 P.3d 1224, 1227 (App. 2002). The balance of hardship favors Plaintiffs if it establishes "probable success on the merits and the possibility of irreparable injury." *Shoen v. Shoen*, 167 Ariz. 58, 63, 804 P.2d 787. 792 (App. 1991).

The Restatement of Torts succinctly sets out the seven factors generally considered by a court when considering injunctive relief:

        (a) the nature of the interest to be protected,
        (b) the relative adequacy to the plaintiff of injunction and
        of other remedies,

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 85303
928-443-9600

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

1  (c) any unreasonable delay by the plaintiff in bringing suit,
   (d) any related misconduct on the part of the plaintiff,
2  (e) the relative hardship likely to result to Bank of America if an
   injunction is granted and to plaintiff if it is denied,
3  (f) the interests of third persons and of the public, and
   (g) the practicability of framing and enforcing the order or judgment.
4

5  *Restatement of Torts 2nd, §936* .

6      a.  *The nature of the interest being protected is the Plaintiff's' home, real*

7          *property, and equity.*

8      Plaintiff has applied for acceptance into the Home Affordable Modification

9  Program.  Pursuant to the Guidelines foreclosure proceedings are to be suspended during

10 consideration of their application.  A foreclosure sale has occurred and she is about to be

11 evicted from her home.

12     b.  *Plaintiff has no other remedy for relief except injunctive relief.*

13     Plaintiff have attempted in good faith to work with Bank of America.  She has met

14 the criteria for the Program and was extremely patient in waiting for paper work. She is at

15 the mercy of the process gone rogue.  Injunctive relief is necessary to void the foreclosure,

16 and stop eviction so that her application can be given due consideration under the

17 Program.  Marks has supplied information, called, supplied more information and

18 continued to call inquiring about the status of the application.  She has done all she can

19 do. The court is her only hope.

20     c. *There has been no unreasonable delay on the part of the Plaintiff.*

21     Plaintiff immediately contacted the lender when they knew of their financial

22 hardship.  Marks has been more than diligent in trying to contact the bank and find

23 answers. Repeated delays, long holds and empty promises have been the wages of that

24 effort. She ultimately had to file suit as no answers were given.

25     d.  *There has been no misconduct on the part of the Plaintiff.*

26

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

1   Marks filed her application, made repeated calls once she had been "approved" and

2   was purely at the mercy of the bank. The only thing she did wrong was to trust Bank of

3   America to deal with her professionally and appropriately.

4          *e.   The relative hardship favors the Plaintiff.*

5   Plaintiff will lose her home, real property, and her livelihood if injunctive relief is

6   not granted.  If injunctive relief is granted until the Marks' application for the Program is

7   dealt with in a appropriate manner,  Bank of America will receive financial incentives

8   from the Program by Plaintiff's participation, avoid taking over a property that is worth

9   less than the loan on it and have a paying asset on its books.

10         *f. The public would be served by requiring Bank of America to follow the*

11          *Program Guidelines and suspend the foreclosure while Plaintiff's*

12          *application is considered.*

13   If Bank of America is allowed to ignore the Program Guidelines in this case, it will

14   likely do so in others, thereby harming other property owners who may be eligible for the

15   Program.  The Program recognizes that absent a suspension of foreclosure proceedings,

16   many homeowners will lose their property to foreclosure while applications are pending.

17   Marks is extremely representative of this dilemma.   It is in the best interests of the public

18   for property owners seeking assistance to have their foreclosure proceedings suspended

19   while they obtain approval from the Program.  In addition, anyone submitting an

20   application needs to be assured, that the stick of dynamite will not blow up in their face

21   without warning.  Otherwise, there is the potential for great abuse.   The application

22   process is deliberately, or by design, ponderous and time consuming allowing the

23   foreclosure to occur before any modification can be obtained. If, a lender has in fact

24   purchased loans at discounts, there is a potential extra incentive to allow foreclosures to

25   proceed and profit by obtaining title to real property that is of greater value than the

26   discounted, defaulted loan.

-9-

*g. Framing the order for injunction is simple as is enforcing it.*

The Court can enjoin the Defendants from evicting Marks from her property until after she receives the documents promised four months ago or an explanation is given for a subsequent denial. .

### Relief Requested

Plaintiff Andrea Marks request that the Court grant a temporary restraining order:

1. Stopping any eviction proceeding and setting aside the foreclosure;

2. Then ordering that Marks' application for assistance be dealt with promptly and in accordance with HAMP guidelines and procedures.

3. For fees and costs associated in obtaining this relief as this matter arises out of contract pursuant to A.R.S. § 12-341.01.

Dated this __*18*__ day of February 2010.

GIL SHAW, ATTORNEY & COUNSELOR AT LAW

By: _____

Gil Shaw, Attorney for Plaintiffs

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

-10-



CERTIFIED MAIL™

7009 2250 0003 0602 6091

RETURN RECEIPT
REQUESTED

Gil Shaw
Attorney & Counselor at Law
105 South Cortez, Second Floor
Prescott, AZ 86303

U.S. POSTAGE
PRES-TD PAID
PRESCOTT AZ
86302
FEB 19 10
AMOUNT
$6.32
0004-3963-10

1000    85016

UNITED STATES
POSTAL SERVICE

Bank of America
c/o CT Corporation System
2394 E Camelback
Phoenix, AZ 85016

85016834342 C02S

| | | |
|---|---|---|
| ANDREA MARKS,<br><br>Plaintiff,<br><br>vs.<br><br>BANK OF AMERICA, *et al*<br>Defendants. | Case No. **P1300CV201000235**<br><br>**RULING** | **FILED**<br>FEB 1 8 2010<br>**DATE:**_____<br>**|0** O=Clock **A** . M.<br>**JEANNE HICKS, CLERK**<br>**BY:** SHEETAL PATEL<br>**Deputy** |

| | |
|---|---|
| **HONORABLE KENTON D. JONES** | **BY:** Terri Marotto-Krzyzyk, Judicial Assistant |
| **DIVISION    4** | **DATE:** February 18, 2010 |

THIS MATTER comes before the Court on Plaintiff's "Motion For An Expedited Temporary Restraining Order and Preliminary Injunction (Emergency Restraining Order Requested)" filed on February 10, 2010. The Court is addressing this issue on **February 18, 2010**. The pleadings do not specifically address, within the caption of the Motion, whether the TRO is being sought with or without notice, and a) there is no indication within the pleadings that the documents have been sent to the Defendant, Bank of America, b) the Defendant, Bank of America has not been heard from on this matter, and c) no position is taken within the Motion for TRO as to why the TRO should proceed without notice.

Rule 65(d), of the Arizona Rules of Civil Procedure, state in pertinent part:

> "...A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney **only** (1) if it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, **and** (2) *the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice or the reasons supporting the claim that notice should not be required...."*

(Emphasis Added)

There is no certification within the record of the efforts made to give notice or the reasons supporting the claim that notice should not be required and, in that, the Motion is deficient. Until the applicant attorney certifies to the court in writing the efforts, if any, which have been made to give notice to the Defendant, or the reasons supporting the claim that notice should not be required, and the Court is able to thereafter address the merits of Plaintiff's position in regard, thereto, the Motion is **DENIED**.

FEB 1 8 2010

P1300CV201000235
Page 2 of 2

Beyond that, the Order Plaintiff requests be entered not only seeks to enjoin the scheduled FED and maintain the status quo, but also asks that the Court "set aside the foreclosure." While the Court, upon proper Motion, is prepared to maintain the status quo until a decision is made as to the balance of the relief sought, the Court is not prepared, through injunction, to decide the ultimate question of fact and law before the Court which is the legitimacy of the foreclosure.

DONE IN CHAMBERS, this 18th day of February, 2010.

cc:    Gil Shaw—105 S. Cortez St., Prescott, AZ 86303
       Division 1

Attorneys/parties have been
notified by phone/fax
Date: 2/18/10  9:10a m

ORIGINAL FILED THIS _____
DAY OF _____
JEANNE HICKS
Clerk Superior Court
By _____
                    S Smisko

1

**GIL SHAW**

2

**Attorney & Counselor at Law**

3

105 South Cortez

Second Floor

4

Prescott, Arizona 86303

928-443-9600

5

gshaw@peoplesrightslaw.com

6

7

Gil Shaw, SBN 009290
Attorney for Plaintiff

8

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9

IN AND FOR YAVAPAI COUNTY

| | |
|---|---|
| 10    ANDREA MARKS, a single woman, | Case No. P1300 CV 2016 60285 |
| 11    Plaintiff, | |
|          Vs. | |
| 12    BANK OF AMERICA  a foreign | |
| 13    corporation, FEDERAL NATIONAL | **FIRST AMENDED COMPLAINT** |
|          MORTGAGE ASSOCIATION dba | |
| 14    Fannie Mae, a Federally Chartered | (Breach Of Contract) |
|          Corporation, BLACK CORPORATIONS | |
| 15    1-5, WHITE PARTNERSHIPS 1-5, | (Declaratory And Injunctive Relief) |
| 16    JOHN DOES 1-5 AND JANE DOES 1-5, | (Quiet Title) |
|          Defendants. | |
| 17 | Trial by Jury is demanded. |

18

Plaintiff alleges:

19

1.  Plaintiff  Andrea Marks (Marks) is a single woman, owning as her sole and

20

separate property, the real property and home located at 5267 North Stetson,

21

Prescott Valley, Arizona. (Property)

22

2.  Defendant Bank of America is upon information and belief is a foreign

23

Corporation, doing business in Yavapai County, Arizona.   Upon information

24

and belief, the original loan on Plaintiff's Property was underwritten or

25

otherwise backed by "Fannie Mae", a privately chartered lending institution and

26

was originally issued by Countrywide Mortage. Bank of America is doing

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

business in Arizona and Yavapai County.  At all times relevant to this complaint, Plaintiff has and continues to deal with Bank of America.

3.  Defendant Federal National Mortgage Association dba Fannie Mae is a federally chartered corporation that upon information and belief claims title to or rights to possession to Plaintiff's Property.

4.  All fictitiously named defendants are named upon information and belief that others may be liable for the acts complained of herein and subject to the relief sought by the Plaintiffs.  Upon their true identities being discovered, leave will be sought to amend the complaint.

5.  Bank of America is a participating financial institution under the "Home Affordable Modification Act Program Guidelines" (Program) of March 4th, 2009, a U.S. Department of the Treasury Program designed to assist homeowners in preventing foreclosure on their homes. Pursuant to the Program, Bank of America is offered certain financial incentives to reduce homeowner's monthly mortgage payments.

6.  Bank of America has assumed loans originally serviced or originating with Countrywide Mortgage, a now defunct institution. Bank of America has assumed ownership of Countrywide's assets and is now servicing loans formally owned by Countrywide Mortgage.

7.  Upon information and belief, Bank of America has received financial consideration and other incentives from the U.S. Government and state governments to administer and modify Countrywide loans and assist homeowners in loan modification.

8.  On or about, August 17th, 2009 Plaintiff Marks, by and through her authorized agent, New York Financial, in reliance upon Bank of America's participation in the Program, submitted an application for homeowner assistance to  Bank of

-2-

America requesting modification of their loan.

9. The application was submitted and Marks was told on October 2nd, 2009 that she had qualified for assistance with a reduction by almost one-half of her mortgage payment.

10. While told verbally of the terms of the loan, Marks wanted to consider the offer. She did so and called Bank of America on October 3rd, 2009, to accept the offer and request the paper work. Bank of America attempted to take a payment that day pursuant to the loan modification, but was unable to process it. Marks was told that she could send her first payment in with her signed loan modification documents that would be forthcoming within the next two weeks.

11. Two weeks went by and no paper work was sent from Bank of America to Marks. She called to inquire about the status of the documents and was told that there could be more delay in getting the paper work to her for signature.

12. By the first of November, there was still no paper work from Bank of America and a foreclosure date was looming. Bank of America personnel told Marks that the foreclosure had been "pushed out" and that the bank was still within some forty five day period to get the modification documents out to Marks.

13. Two more weeks went by and Marks called the bank again on November 14th, this time spending almost three hours on the phone. Marks was ultimately told that there was a problem, but it was a bank error and Bank of America would fix it and get the documents to her. Marks was also told that the foreclosure date was "pushed out" again.

14. Between October 3rd, 2009 and December 30th, 2009, Marks never received any communication or documents from the bank regarding the foreclosure proceedings other than verbal assurances that it had been "pushed" back.

15. Just prior to the Christmas holidays, Marks attempted to call Bank of America

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

-3-

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-5600

several times but due to extremely long wait periods, she was unable to make contact with anybody.

16. In January 14th, 2010, with no paper work still forthcoming from Bank of America, Marks was personally informed that her home had sold at a trustee's sale and that "Fannie Mae" was the new owner.

17. Pursuant to the Program, any request for consideration for alternative foreclosure prevention options should suspend any foreclosure action. If the homeowners are accepted into the Trial Program, foreclosure actions are suspended.

18. Upon Plaintiff's application to the Program, Defendant Bank of America, should have suspended any and all foreclosure action.  Defendant Bank of America is required to thus suspend foreclosure action as a recipient of incentive funds from the Program.

19. Plaintiff Marks meets all applicable guidelines for consideration of a loan modification and upon information and belief would qualify for assistance and modification of her loan with Bank of America.

20. Upon information and belief, Defendant Bank of America has purchased the Plaintiffs Loan from the originator at a substantial discount and thus has an incentive not to modify loans and otherwise proceed to foreclosure so that it owns the real property.

21. Plaintiff's application has never been denied, and was in fact verbally approved. Any foreclosure or trustee's sale should have been suspended pending the approval or at the very least written notification that the application was not approved.

22. On or about February 10th, 2010, Plaintiff was served with a forcible detainer action P1300 CV 2010-00246 seeking possession of her home by Defendant

-4-

Federal National Mortgage Association.

23. The aforementioned forcible detainer action was filed pursuant to Trustee's deed, obtained through a trustee sale, done in contradiction to the U.S. Treasury Guidelines, requiring all foreclosure proceedings to be suspended during the Plaintiff's evaluation for loan modification or foreclosure avoidance.

24. In the event Plaintiff is found guilty of forcible detainer, she will lose her possessory interest in the property despite having legal title to it.

## COUNT ONE
## (BREACH OF CONTRACT)

25. Plaintiffs re-allege all previous allegations as if fully set forth herein.

26. Plaintiff is a third party beneficiary of Defendant Bank of America's contractual obligations with the U.S. Treasury, and also has an existing contractual relationship that is now modified in part by the Home Affordable Program. Once Plaintiff undertakes, in good faith, to seek modification of her loan with Defendant Bank of America, Bank of America is required to act in good faith and process the application in timely fashion and in accordance with the Program guidelines and requirements.

27. At all times relevant to this complaint, Plaintiff has acted in good faith.

28. Plaintiff is eligible for loan modification but for the delay and bad faith acts of the Defendant Bank of America.

29. Plaintiff's ownership interest in her property is now at risk due to the lack of good faith, and the Bank of America not processing Plaintiff's HAMP application in accordance with guidelines and other regulations.

30. Failure to suspend the foreclosure proceedings per U.S. Treasury requirements has now resulted in a potential loss of Plaintiff Marks' home.

31. As a result of this breach contract and breach of good faith and fair dealing,

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86301
928-443-5600

-5-

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-445-9600

1   Plaintiff will suffer severe economic loss, including but not limited to the loss

2   of any her home, relocation costs, and other damages in amounts to be proven

3   at trial, but in amounts less than $75,000.

4   32. Plaintiff is also an insurance broker, whose business may be severely affected

5   by a foreclosure proceeding.  Plaintiff also has her office located in her home.

6   Moving or relocation will cause loss of business and additional expense but in

7   amounts to be proven at trial but in amounts less than $75,000 dollars.

8   33. As the matter arises out of contract, Plaintiffs are entitled their reasonable

9   attorney fees.

10   Wherefore as to Count One, Plaintiffs ask the court for the following:

11   A.  For general and specific  damages in amounts to be proven at

12   trial of breach of contract;

13   B.  For attorney fees and costs as the matter arises out of A.R.S. §12-

14   341.01;

15   C.  For costs and other such relief as the court feels is just and

16   equitable under the circumstances.

17

18   **COUNT TWO**

19   **(QUIET TITLE)**

20   34.  Plaintiff re-alleges all previous allegations as if fully set forth herein.

21   35. Defendant Fannie May is attempting to take possession of Plaintiff's home

22   pursuant to Trustee Deed resulting from a trustee sale.

23   36. Should a court find Plaintiff guilty of forcible detainer, merely on right to

24   possession and does not adjudicate the validity of the underlying trustee's sale,

25   Defendant Fannie Mae will have asserted a property right that is contrary to the

26   rights  and legal interests of the Plaintiff. Defendant's actions and claims

-6-

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

regarding its right to possess Plaintiff's real property are thus adverse to Plaintiff and legally inferior to those real property interests asserted by and belonging to Plaintiff.

WHEREFORE AS TO COUNT TWO, Plaintiff asks for the following relief:

A. That all adverse claims to Plaintiff's real property, be  determined by this court by judgment or decree;

B. That the court quiet title in favor of Plaintiff and against the Defendant, Federal National Insurance Association and any successor or assign;

C. For fees and costs as this matter arises out of contractual relationships with the Defendants;

D. For other such relief as is just and equitable under the circumstances.

## COUNT THREE

## (REQUEST FOR TEMPORARY AND PRELIMINARY INJUNCTION AND DECLARATORY RELIEF)

37. Plaintiff re-alleges all previous allegations as if fully set forth herein.

38. Plaintiff's interest in her real property has been punitively foreclosed on by Bank of America and or the Federal National Mortgage Association.  Pursuant to the Home Affordable Act, Defendants are required to forebear or suspend any foreclosure proceedings against the Plaintiffs' property once Plaintiffs' have filed an application for assistance under the Program and that application has been acted upon.

39. Despite verbal assurances that Bank of America had approved a loan modification, Plaintiff Marks has no evidence that her application has been formally approved or denied.

40. Despite repeated assurances from the Defendant Bank of America that foreclosure proceedings were being "pushed back", such proceedings in fact

-7-

occurred.

41. Plaintiff has now been notified that the Federal National Mortgage Association has retained counsel and a demand has been made upon her to surrender her home pursuant to A.R.S. §12-1173.01.

42. There is a strong likelihood that immediate, irreparable harm will be done to Plaintiffs during litigation if the foreclosure proceedings and imminent eviction proceedings are not stayed or otherwise vacated pending resolution of this case on the merits.

43. Defendants are required to suspend foreclosure proceedings against the Plaintiff during the pendency of Plaintiff's application for assistance under the Program. Plaintiff is also entitled to a suspension of foreclosure proceedings if any modification is offered. Plaintiff was repeatedly assured that a modification was approved, but no paper work was ever sent despite repeated requests and assurances that it would be.

44. As such, Plaintiff has a strong likelihood of prevailing on the merits of her breach of contract claim but only after forcible detainer proceeding have occurred causing her to be removed from her home.

45. Plaintiff will suffer irreparable harm if restraints are not granted pending litigation against the Defendants' foreclosure proceedings/forcible detainer proceedings which cannot be compensated by a bond.

46. Defendants have taken a position contrary to law and fact that they need not suspend the foreclosure/eviction proceedings against the Plaintiff during the pendency of Plaintiff's application for assistance under the Program.

47. As such, a dispute exists as to whether the Defendants are required to suspend foreclosure/eviction proceedings against the Plaintiffs during the pendency of

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR.
PRESCOTT, ARIZONA 86303
928-443-9600

the Plaintiffs application for assistance under the Program.

Wherefore as to Count Two, Plaintiff asks for the following relief:

A.  For a temporary restraining order against Defendants suspending the foreclosure/forcible detainer proceedings now proceeding against the Plaintiff;

B.  For a preliminary restraining order against the Defendants suspending the foreclosure proceedings/ forcible detainer proceedings against the Plaintiff pending final resolution of the Plaintiff's breach of contract claim;

C.  For Declaratory relief and findings of fact and law that Plaintiff's application to the Program does suspend any foreclosure proceedings and as such the subsequent foreclosure that occurred in void as a matter of law and there exists no further basis for any legal proceeding consistent with foreclosure of the Plaintiff's interest in the real property.

D.  For fees and costs incurred pursuant to A.R.S. § 12-341.01;

E.  For other such relief at equity or law that the court finds reasonable.

Dated this _12ᵗʰ_ day of February 2010.

GIL SHAW, ATTORNEY & COUNSELOR AT LAW

By: _____

Gil Shaw, Attorney for Plaintiff Andrea Marks

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

## VERIFICATION

I, Gil Shaw, upon penalty of perjury do declare that I am the attorney for the Plaintiff in the above captioned action and that I am authorized to make this verification on the Plaintiff's behalf. I have read the contents of the complaint and believe that the allegations made therein are true and accurate to the best of my personal knowledge.

Dated this 12th Day of February, 2010

Gil Shaw

-10-

ORIGINAL FILED THIS _____
DAY OF FEB 1 0 2010
JEANNE HICKS
Clerk Superior Court
By _____ Deputy
Sheonna Kelbaugh

1
2   GIL SHAW
    Attorney & Counselor at Law
3   105 South Cortez
    Second Floor
    Prescott, Arizona 86303
4   928-443-9600
    gshaw@peoplesrightslaw.com
5

6   Gil Shaw, SBN 009290
    Attorney for Plaintiffs

7       IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

8          IN AND FOR YAVAPAI COUNTY 2 0 1 0 0 0 0 2 3 5

9   ANDREA MARKS, a single woman,        Case No. CV P1300
10  Plaintiff,
    Vs.
11  BANK OF AMERICA  a foreign
12  corporation, FEDERAL NATIONAL            MOTION FOR
    MORTGAGE ASSOCIATION dba
                                      ORDER TO SHOW CAUSE
13  Fannie Mae, a Federally Chartered
    Corporation, BLACK CORPORATIONS
14  1-5, WHITE PARTNERSHIPS 1-5,
15  JOHN DOES 1-5 AND JANE DOES 1-5,
    Defendants.
16

17      Plaintiff Andrea Marks, by and through undersigned counsel and pursuant to

18  Arizona Rules of Civil Procedure 6(d) and 65, requests the Court issue an Order to Show

19  Cause why a preliminary injunction should not issue as requested in the Complaint filed in

20  this matter.  This Motion is based on the verified Complaint in this action and

21  accompanying Motion for an Expedited Temporary Restraining Order and Preliminary

22  Injunction, which are incorporated herein.

        Dated this _16_ day of February 2010.
23      GIL SHAW, ATTORNEY & COUNSELOR AT LAW

24

25  By: _____
        Gil Shaw, Attorney for Plaintiffs
26

ORIGINAL FILED THIS
DAY OF ___ FEB 1 0 2010
JEANNE HICKS
Clerk Superior Court
By _____
        Deputy

1

2

GIL SHAW
Attorney & Counselor at Law
105 South Cortez
Second Floor
Prescott, Arizona 86303
928-443-9600
gshaw@peoplesrightslaw.com

3

4

5

6   Gil Shaw, SBN 009290
    Attorney for Plaintiff

7

8          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9                  IN AND FOR YAVAPAI COUNTY

| | |
|---|---|
| ANDREA MARKS, a single woman, Plaintiff, Vs. BANK OF AMERICA a foreign corporation, FEDERAL NATIONAL MORTGAGE ASSOCIATION dba Fannie Mae, a Federally Chartered Corporation, BLACK CORPORATIONS 1-5, WHITE PARTNERSHIPS 1-5, JOHN DOES 1-5 AND JANE DOES 1-5, Bank of Americas | Case No. CV 2 0 1 0 0 0 0 2 3 5  MOTION FOR AN EXPEDITED TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION  (Emergency Restraining Order Requested) |

10

11

12

13

14

15

16

17          Plaintiff, Andrea Marks,  by and through undersigned counsel and pursuant to

18   Arizona Rule of Civil Procedure 65, request the Court to issue, on an expedited basis, a

19   temporary restraining order and subsequently grant a preliminary injunction enjoining

20   Bank of Americas  from further proceedings consistent with any foreclosure proceeding

21   that have occurred relating to the Plaintiff's real property. This Motion is more fully

22   supported by the following Memorandum of Points and Authorities, the Verified

23   Complaint filed in this action and the Affidavit of Andrea Marks.

24   //

25

26

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

## Memorandum of Points and Authorities

### Factual Basis for Injunctive Relief

### A. The Plaintiff seek loan modification assistance in August of 2009 and is given verbal approval on October 2nd 2009  and is assured that paperwork is soon to follow.

Plaintiff is a single woman, owning as her sole and separate property, real property and home located at 5267 North Stetson, Prescott Valley, Arizona. (Property)[1] Plaintiff hired a mortgage modification assistance firm on August 17th, 2009  New York Financial, to assist her in submitting an application for homeowner assistance to  Bank of America requesting modification of her loan. [2]

Plaintiff Marks application was submitted and she was told on October 2nd, 2009 that she  had indeed qualified for assistance  and modification of her loan with a reduction by almost one half of her mortgage payment. [3]

Marks asked if she could have a day or so to consider the terms. She called Bank of America on October 3rd, 2009, to accept the offer and request the paperwork. [4]  Bank of America attempted to take a payment that day pursuant to the loan modification, but was unable to process it. Marks  was prepared to make a payment, but was told that she  could send her first payment in with the signed loan modification documents that would be forthcoming within the next two weeks. [5]

### B. Waiting for the paper work - waiting for Godot.

Marks has been waiting for documents in excess of *four months* since the original notification on October 3rd , 2009 that she had indeed qualified. Two weeks after the October 3rd notification, Marks called and was told it could be a bit longer. However, by

---

[1] Declaration of Andrea Marks, ¶1(Exhibit A)
[2] Id ¶2
[3] Id ¶3
[4] Id ¶4
[5] Id ¶4

-2-

1    the end of October no paper work or agreements had been sent for her signature or

2    approval [6]

3           After being told in a November 1st, 2009 call by Bank of America that it had "45

4    days" to get the paper work out, Marks waited until November 15th to inquire yet again

5    about the lack of documents. After spending over three hours on the phone, she was

6    assured that the loan modification paperwork would be on its way. In addition, she was

7    told that the foreclosure had been "pushed back" and that the delay seemed to be some

8    sort of a "bank error" that would be corrected. [7]

9           For the next 45 days, Marks waited for documents and communication from Bank

10   of America. An attempt to contact the bank prior to Christmas met with extended hold

11   times and no communication with any bank representative[8].

12   **C.  Bank of America  then foreclosed on Plaintiff's home and eviction**

13   **proceedings are imminent.**

14          On January 14th, 2010, Marks was informed that the foreclosure proceedings she

15   assumed were on hold, apparently were not.  A gentleman personally notified her that a

16   foreclosure had occurred and that she could expect eviction proceedings to follow. [9]

17          Unless injunctive relief is immediately granted, Plaintiff will suffer immediate,

18   irreparable harm. She has received notice that eviction proceeding are soon to be filed.[10]

19   Her office is run out of her home. She is an insurance broker who will suffer severe

20   consequences if the foreclosure is not set aside. Relocation and moving will result in a

21   substantial expense. She has to "self report" the foreclosure and it will result in the

22   destruction of her broker relationships.[11] The lender, however, bears no hardship as there

23   
_____

24   [6] Id ¶¶4,5
     [7] Id ¶¶6,7

25   [8] Id ¶¶8,9
     [9] Id ¶10

26   [10] Id¶15
     [11] Id.¶¶13,14

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

-3-

1  are financial incentives paid by the Program for participating in the Program and

2  suspending foreclosure while the application is considered. There is a strong likelihood

3  that Plaintiff will succeed on the merits of her case as the Guidelines for the Program are

4  clearly set forth, the Plaintiff has met all requirements of the Program, and yet Bank of

5  America refuses to follow the Guidelines set forth for lender participants in the Program.[12]

6

7                          Legal Authority and Arguments

8   I.  The Home Assistance Mortgage Program is designed to assist homeowners,

9        not drive them mad with frustration to the point of giving up.

10       A.  HAMP requires any foreclosure proceedings to be suspended during the

11            application process and or any subsequent trial period of loan modification.

12            Bank of America has ignored this mandate.

13   The U.S. Treasury Department has set out specific guidelines that any financial

14  institution must follow in order to be eligible for government subsidies of loan

15  modification efforts. Those guidelines require that:

16                Any foreclosure action will be temporarily
                 suspended during the trial period, or while borrowers
17               are considered for alternative foreclosure prevention
                 options. [13]

18   Once Marks submitted her application for assistance she began seeking "alternative

19  foreclosure options" that required the foreclosure or trustee sale proceedings to be

20  suspended. Bank of America has acknowledged this duty to suspend the foreclosure as

21  bank representatives repeatedly assured Marks that the foreclosure proceedings had been

22  "pushed back" or postponed on several occasions. [14]

23   Yet, despite receiving word that she had been approved for a modification and

24

25  [12] Id ¶ 11

26  [13] Treasury Guidelines, page 3, Exhibit B attached hereto.
    [14] Declaration of Andrea Marks, ¶¶ 6,7

GIL SHAW, ATTORNEY & COUNSELOR AT LAW

105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

-4-

1    would thus move into the "trial period," a foreclosure occurred.  Despite being told the

2    foreclosure proceeding had been "pushed back," the foreclosure occurred.  And despite

3    the fact that Marks never received any notification beyond the oral communication that

4    she had been accepted, the foreclosure occurred.

5           Once Marks made inquiries and submitted information regarding modification,

6    Bank of America was *required* to screen her situation and see if she would qualify for

7    assistance.[15] Bank of America apparently did so, found Marks qualified, but continued

8    with the foreclosure nonetheless. There would be virtually no incentive for a homeowner

9    to submit to this process if it would allow a bank to do what Bank of America did to

10   Marks. She is sitting on a stick of dynamite. The fuse was lit. Bank of America told her it

11   put the fuse out, yet it kept burning and without warning the foreclosure exploded in her

12   face.

13          B.  <u>HAMP should truly assist homeowners , not lull them into a false sense of</u>

14              <u>security to only take away their homes.</u>

15          The HAMP program is so new that little case law exists. A federal district court

16   case out of Minnesota, that while instructive in many respects, is not on all points with the

17   facts of this case.[16] However, *Williams* provides a detailed description of how the HAMP

18   process is supposed to function from application through any offered loan modification.

19                    HAMP is aimed to financially assist three to four
                      million homeowners who have defaulted on their
20                    mortgages or who are in imminent risk of default by
                      reducing monthly payments to sustainable levels.
21                    Bowman Aff., [Docket No. 9], Ex. B at 1 (Treasury
                      Supplemental Directive 09-01 describing the HAMP
22                    and eligibility requirements, hereinafter referred to as
                      "SD 09-01"). The HAMP works by providing financial
23                    incentives to participating mortgage servicers to
                      modify the terms of eligible loans. *See* Maggiano Decl.
24

25   _____
     [15] Treasury Guidelines, page 5.
26   [16] *Williams v Giether et al,* 2009 WL 3757380 (Fed.D.Minn. 2009) [WestLaw copy attached hereto]

-5-

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
103 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

[Docket No. 83] ¶ 16. Treasury provides guidance to servicers by defining the class of borrowers who are eligible for a loan modification and setting forth specific modification protocols.[17]

*Williams* sought a finding **after** a loan modification was denied that there was a property right to a loan modification under the law. The class of Plaintiffs then argued that once a property right was established then procedural due process protections must apply.[18] While that law states that there "shall be consent, where appropriate…" the federal district court found there was no intent on the part of Congress to "create a property interest in loan modifications …[or] an absolute duty …to consent to a loan modification." [19] While noting that the Congress did not intend to mandate loan modifications, the court evidently <u>saw the intent was clear to have the process of modification occur.</u>  The court pointed out the Treasury *requires* the loan servicers to provide adequate reasons for a loan modification denial and to furnish the Treasury and Fannie May with that specific reason for denial.[20]

As a predicate to any final foreclosure, HAMP thus requires the lending institution to document the reason for any loan denial.  Marks was never provided *anything* from Bank of America except verbal assurance she had been **approved** for modification.  Logic would then dictate that the bank must either provide the documents to consummate the modification or justify in writing the reasons why modification would not be appropriate. Marks has been left in a twilight zone of an approval never documented, or a change of heart and a disapproval, also never documented. Bank of America must do one of two things: provide documents to modify the loan, or provide written reasons as to why its first inclination was wrong. The process to determine eligibility is not discretionary. It

---

[17] Id at page 3
[18] Id at page 6
[19] Id at page 7
[20] Id at page 5

-6-

1    must occur.  The process, if one could call it that, was all but junked and thrown out the

2    window for Marks.

3    **II. Injunctive Relief is appropriate. Marks will demonstrate the likelihood she**

4         **will prevail  as Bank of America has utterly failed to handle her loan in**

5         **accordance with the HAMP program.**

6    A.   <u>Marks will meet all the tests required for injunctive relief.  She is fighting for</u>

7         <u>her home, has done nothing wrong and can demonstrate the importance of</u>

8         <u>having the HAMP program administered in accordance with law.</u>

9

10   Superior Court Judges have the authority to grant injunctive relief in any case in

11   which a party is entitled to injunction under the principles of equity.  A.R.S. § 12-1801. In

12   order to grant a request for preliminary injunction, the plaintiffs must establish 1) that the

13   balance of hardship favors them, 2) the strong likelihood of their success on the merits,

14   and 3) the possibility of irreparable harm if relief is not granted.  *Power P.E.O., Inc. v.*

15   *Employees Ins. of Wausau*, 201 Ariz. 559, 562, 38 P.3d 1224, 1227 (App. 2002).  The

16   balance of hardship favors Plaintiffs if it establishes "probable success on the merits and

17   the possibility of irreparable injury." *Shoen v. Shoen*, 167 Ariz. 58, 63, 804 P.2d 787. 792

18   (App. 1991).

19   The Restatement of Torts succinctly sets out the seven factors generally considered

20   by a court when considering injunctive relief:

21        (a) the nature of the interest to be protected,

22        (b) the relative adequacy to the plaintiff of injunction and
          of other remedies,

23        (c) any unreasonable delay by the plaintiff in bringing suit,

24        (d) any related misconduct on the part of the plaintiff,

25        (e) the relative hardship likely to result to Bank of America if an
          injunction is granted and to plaintiff if it is denied,

26        (f) the interests of third persons and of the public, and

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

-7-

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

1    (g) the practicability of framing and enforcing the order or judgment.

2  *Restatement of Torts 2nd, §936* .

3         *a.  The nature of the interest being protected is the Plaintiff's' home, real*

4              *property, and equity.*

5    Plaintiff has applied for acceptance into the Home Affordable Modification

6  Program.  Pursuant to the Guidelines foreclosure proceedings are to be suspended during

7  consideration of their application.  A foreclosure sale has occurred and she is about to be

8  evicted from her home.

9         *b.  Plaintiff has no other remedy for relief except injunctive relief.*

10   Plaintiff have attempted in good faith to work with Bank of America.  She has met

11  the criteria for the Program and was extremely patient in waiting for paper work. She is at

12  the mercy of the process gone rogue.  Injunctive relief is necessary to void the foreclosure,

13  and stop eviction so that her application can be given due consideration under the

14  Program.  Marks has supplied information, called, supplied more information and

15  continued to call inquiring about the status of the application.  She has done all she can

16  do. The court is her only hope.

17        *c. There has been no unreasonable delay on the part of the Plaintiff.*

18   Plaintiff immediately contacted the lender when they knew of their financial

19  hardship.  Marks has been more than diligent in trying to contact the bank and find

20  answers. Repeated delays, long holds and empty promises have been the wages of that

21  effort. She ultimately had to file suit as no answers were given.

22        *d. There has been no misconduct on the part of the Plaintiff.*

23   Marks filed her application, made repeated calls once she had been "approved" and

24  was purely at the mercy of the bank. The only thing she did wrong was to trust Bank of

25  America to deal with her professionally and appropriately.

26  //

-8-

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

1    *e. The relative hardship favors the Plaintiff.*

2        Plaintiff will lose her home, real property, and her livelihood if injunctive relief is

3    not granted.  If injunctive relief is granted until the Marks' application for the Program is

4    dealt with in a appropriate manner,  Bank of America will receive financial incentives

5    from the Program by Plaintiff's participation, avoid taking over a property that is worth

6    less than the loan on it and have a paying asset on its books.

7        *f. The public would be served by requiring Bank of America to follow the*

8            *Program Guidelines and suspend the foreclosure while Plaintiff's*

9            *application is considered.*

10       If Bank of America is allowed to ignore the Program Guidelines in this case, it will

11   likely do so in others, thereby harming other property owners who may be eligible for the

12   Program.  The Program recognizes that absent a suspension of foreclosure proceedings,

13   many homeowners will lose their property to foreclosure while applications are pending.

14   Marks is extremely representative of this dilemma.   It is in the best interests of the public

15   for property owners seeking assistance to have their foreclosure proceedings suspended

16   while they obtain approval from the Program.  In addition, anyone submitting an

17   application needs to be assured, that the stick of dynamite will not blow up in their face

18   without warning.  Otherwise, there is the potential for great abuse.   The application

19   process is deliberately, or by design, ponderous and time consuming allowing the

20   foreclosure to occur before any modification can be obtained. If, a lender has in fact

21   purchased loans at discounts, there is a potential extra incentive to allow foreclosures to

22   proceed and profit by obtaining title to real property that is of greater value than the

23   discounted, defaulted loan.

24       *g.  Framing the order for injunction is simple as is enforcing it.*

25       The Court can enjoin the Defendants from evicting Marks from her property until

26   after she receives the documents promised four months ago or an explanation is given for

a subsequent denial.

## Relief Requested

Plaintiff Andrea Marks request that the Court grant a temporary restraining order:

1. Stopping any eviction proceeding and setting aside the foreclosure;

2. Then ordering that Marks' application for assistance be dealt with promptly and in accordance with HAMP guidelines and procedures.

3. For fees and costs associated in obtaining this relief as this matter arises out of contract pursuant to A.R.S. § 12-341.01.

Dated this _10_ day of February 2010.

GIL SHAW, ATTORNEY & COUNSELOR AT LAW

By: _____

Gil Shaw, Attorney for Plaintiffs

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

-10-

# Exhibit A

1

GIL SHAW
Attorney & Counselor at Law
105 South Cortez
Second Floor
Prescott, Arizona 86303
928-443-9600
gshaw@peoplesrightslaw.com

2

3

4

5

6   Gil Shaw, SBN 009290
    Attorney for Plaintiffs

7

8                    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9                          IN AND FOR YAVAPAI COUNTY

| | |
|---|---|
| ANDREA MARKS, a single woman, Plaintiff, Vs. BANK OF AMERICA a foreign corporation, FEDERAL NATIONAL MORTGAGE ASSOCIATION dba Fannie Mae, a Federally Chartered Corporation,BLACK CORPORATIONS 1-5, WHITE PARTNERSHIPS 1-5, JOHN DOES 1-5 AND JANE DOES 1-5, Defendants. | Case No. P1300 CV  DECLARATION OF ANDREA MARKS |

10

11

12

13

14

15

16

17

18   Under Penalty of perjury, I, Andrea Marks state the following is true:

19   1.   I am single woman, owning as my sole and separate property, real property and

20        home located at 5267 North Stetson, Prescott Valley, Arizona. (Property)

21   2.   On or about, August 17th, 2009 I, by and through my authorized agent, New

22        York Financial, in reliance upon Bank of America's participation in Home

23        Affordable Mortgage Program, submitted an application for homeowner

24        assistance to Bank of America requesting modification of my loan.

25   3.   The application was submitted and I was told on October 2nd, 2009 that I had

26

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

1  qualified for assistance with a reduction by almost one half of her mortgage
2  payment.

3  4.  Bank personnel gave me some partial parameters of the loan, but I wanted to
4  consider the offer. I took twenty four hours to do so and called Bank of
5  America on October 3rd, 2009, to accept the offer and request the paper work.
6  Bank of America attempted to take a payment that day pursuant to the loan
7  modification but was unable to process it. I was prepared to make a payment
8  but was told that I could send my first payment in with the signed loan
9  modification documents that would be forthcoming within the next two weeks.
10  I was told that indeed the file was noted that payment could accompany the
11  signed documents.

12  5.  Two weeks went by and no paper work was sent from Bank of America. I
13  called to inquire about the status of the documents and was told that there could
14  be more delay in getting the paper work for my signature.

15  6.  By the first of November, there was still no paper work from Bank of America
16  and a foreclosure date was looming. Bank of America personnel told me that
17  the foreclosure had been "pushed out" and that the bank was still within some
18  forty five day period to get the modification documents out to me for signature.

19  7.  Two more weeks went by and I call the bank again on November 14th, this time
20  spending almost three hours on the phone. Ultimately I was told that there was
21  a problem, but it was a bank error and Bank of America would fix it and get the
22  documents to me. I was also told that the foreclosure date was "pushed out"
23  again.

24  8.  Between October 3rd, 2009 and December 30th, 2009, I never received any
25  communication or documents from the bank regarding the foreclosure
26  proceedings other than verbal assurances that it had been "pushed" back. Nor

did I receive and document of any kind.

9.  Just prior to the Christmas holidays, I tried to call Bank of America several times but due to extremely long wait periods, I could not make contact with anybody.

10. In January 14th, 2010, with no paper work still forthcoming from Bank of America, a gentleman came to my house and personally informed that me home had sold at a trustee's sale and that "Fannie Mae" was the new owner.

11. I firmly believe that I meet all applicable guidelines for consideration of a loan modification and upon information and belief would qualify for assistance and modification of my loan with Bank of America.

12. As of the date of this declaration I have received neither written documents regarding the verbal approval of my loan modification nor any documents denying my request for loan modification.

13. I am a licensed insurance broker with a home office. A permanent foreclosure on my record will destroy my business.

14. My home office is located in my home. Moving or relocation will cause loss of business and additional expense.

15. I have now been notified that the Federal National Mortgage Association has retained counsel and a demand has been made upon me to surrender my home, pursuant to A.R.S. §12-1173.01. (See letter from Tiffany & Bosco, attached hereto as Exhibit A.)

Dated this 3 day of February 2010.

By: _____

ANDREA MARKS

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

-3-

# Exhibit B

# Home Affordable Modification Program Guidelines
## March 4, 2009

*Trial loan modifications consistent with these Guidelines may be offered to homeowners beginning on this date, March 4, 2009, and may be considered for acceptance into the Home Affordable Modification Program upon completion of the trial period and other conditions. These Guidelines, however, do not constitute a contract offer binding on the Department of the Treasury.*

<u>Program Elements Described in the Guidelines</u>

| | |
|---|---|
| **Monthly Payment Reduction Cost Share:** | Treasury will partner with financial institutions to reduce homeowners' monthly mortgage payments. The lender will have to first reduce payments on mortgages to no greater than 38% Front-End Debt-to-Income (DTI) ratio. Treasury will match further reductions in monthly payments dollar-for-dollar with the lender/investor, down to a 31% Front-End DTI ratio for the borrower. |
| **Servicer Incentive Payments and Pay for Success Fees:** | Servicers will receive an up-front Servicer Incentive Payment of $1,000 for each eligible modification meeting guidelines established under this initiative. Servicers will also receive Pay for Success payments –as long as the borrower stays in the program – of up to $1,000 each year for up to three years. <br><br> Similar incentives will be paid for Hope for Homeowner refinances. |
| **Borrower Pay-for-Performance Success Payments:** | Borrowers are eligible to receive a Pay-for-Performance Success Payment that goes straight towards reducing the principal balance on the mortgage loan as long as the borrower is current on his or her monthly payments. Borrowers can receive up to $1,000 of Pay-for-Performance Success Payments each year for up to five years. |
| **Current Borrower One-Time Bonus Incentive:** | One-time bonus incentive payments of $1,500 to lender/investors and $500 to servicers will be provided for modifications made while a borrower is still current on mortgage payments. The servicer will be required to maintain records and documentation evidencing that the Trial Period payment arrangements were agreed to while the borrower was less than 30 days delinquent. The servicer must comply with any express pooling and servicing contractual restrictions for modifying current loans. |

1

| Program Payment Conditions | No payments under the program to the lender/investor, servicer, or borrower will be made unless and until the servicer has entered into the program agreements with Treasury's financial agent. Servicers must enter into the program agreements with Treasury's financial agent no later than December 31, 2009. |
|---|---|

## Eligibility Requirements

| Pooling and Servicing Agreements: | The program guidelines reflect usual and customary industry standards for mortgage loan modifications contained in typical servicing agreements, including pooling and servicing agreements (PSAs) governing private label securitizations. Participating servicers are required to consider all eligible loans under the program guidelines unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. Participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties. |
|---|---|
| Origination Date of Loan Subject to Modification: | The mortgage to be modified must have been originated on or before January 1, 2009. |
| Program Expiration: | New borrowers will be accepted until December 31, 2012. Program payments will be made for up to five years after the date of entry into a Home Affordable Modification. Monitoring will continue through the life of the program. |
| Qualification Terms: | <ul><li>The home must be an owner occupied, single family 1-4 unit property (including condominium, cooperative, and manufactured home affixed to a foundation and treated as real property under state law).</li><li>The home must be a primary residence (verified with tax return, credit report, and other documentation such as a utility bill).</li><li>The home may not be investor-owned.</li><li>The home may not be vacant or condemned.</li><li>Borrowers in bankruptcy are not automatically eliminated from consideration for a modification.</li><li>Borrowers in active litigation regarding the mortgage loan can qualify for a modification without waiving their legal rights.</li><li>First lien loans must have an unpaid principal balance (prior to capitalization of arrearages) equal to or less than:<ul><li>1 Unit: $729,750</li><li>2 Units: $934,200</li></ul></li></ul> |

2

| | o  3 Units: $1,129,250<br>o  4 Units: $1,403,400 |
|---|---|
| **In Foreclosure Process:** | Any foreclosure action will be temporarily suspended during the trial period, or while borrowers are considered for alternative foreclosure prevention options.  In the event that the Home Affordable Modification or alternative foreclosure prevention options fail, the foreclosure action may be resumed. |
| **Current LTV:** | There is no minimum or maximum LTV ratio for eligibility purposes. |
| **Loan Type Exclusions:** | Loans can only be modified under the Home Affordable Modification program once. |
| **Subordinate Financing:** | Subordinate liens are not included in the Front-End DTI calculation, but they are included in the Back-End DTI calculation. |
| **Solicitation to Borrowers/ Incoming Inquiries:** | Servicers should follow any existing express contractual restrictions with respect to solicitation of borrowers for modifications. |

**Underwriting Analysis**

| **Front-End DTI Target:** | Front-End DTI is the ratio of PITIA to Monthly Gross Income.  PITIA is defined as principal, interest, taxes, insurance (including homeowners insurance and hazard and flood insurance) and homeowners association and/or condominium fees.  Mortgage insurance premiums are excluded from the PITIA calculation.<br><br>The Front-End DTI Target is 31%.  The Standard Waterfall step that results in a Front-End DTI closest to 31%, without going below 31%, will satisfy the Front-End DTI Target.  There is no restriction on reducing Front-End DTI below 31%, but any portion of the reduction below 31% will not be covered by the Payment Reduction Cost Share. |
|---|---|
| **Property Value:** | The servicer may use, at its discretion, either one of the government sponsored enterprises (GSEs) automated valuation model (AVM) – provided that the AVM renders a reliable confidence score – or a broker price opinion (BPO). |

3

As an alternative, the servicer may rely on the AVM it uses internally provided that (i) the servicer is subject to supervision by a Federal regulatory agency, (ii) the servicer's primary Federal regulatory agency has reviewed the model and/or its validation and (iii) the AVM renders a reliable confidence score.

If the GSE or servicer AVM is unable to render a value with a reliable confidence score, the servicer must obtain an assessment of the property value utilizing a property valuation method acceptable to the servicer's Federal regulatory agency, *e.g.* in accordance with the Interagency Appraisal and Evaluation Guidelines (as though such guidelines apply to loan modifications), or a BPO.

In all cases, the property valuation may not be more than 60 days old.

| | |
|---|---|
| **Income and Asset Validation:** | The borrower's income will be verified by requiring a signed Form 4506-T (Request for Transcript of Tax Return) and obtaining the most recent tax return on file for each borrower on the note. For wage earners, the two most recent pay stubs for each wage earner on the note will also be required. For self-employed borrowers or for non-wage income, the borrower's income will be verified by obtaining other third party documents that provide reasonably reliable evidence of income. <br><br> Borrowers must also represent and warrant that they do not have sufficient liquid assets to make their monthly mortgage payments. |
| **Monthly Gross Income:** | The borrower's Monthly Gross Income is the amount before any payroll deductions includes wages and salaries, overtime pay, commissions, fees, tips, bonuses, housing allowances, other compensation for personal services, Social Security payment, including Social Security received by adults on behalf of minors or by minors intended for their own support, annuities, insurance polices, retirement funds, pensions, disability or death benefits, unemployment benefits, rental income and other income. <br><br> Monthly net income can be used for preliminary screening and qualification. If used, the servicer will need to multiply net income by 1.25 to get to an estimate of Monthly Gross Income. |
| **Back-End DTI:** | The Back-End DTI is the ratio of the borrower's total monthly debt payments (such as Front-End PITIA, any mortgage insurance premiums, payments on all installment debts, monthly payments on all junior liens, alimony, car lease payments, aggregate negative net rental income from |

| | |
|---|---|
| | all investment properties owned, and monthly mortgage payments for second homes) to the borrower's Monthly Gross Income. The servicer must validate monthly installment, revolving debt and secondary mortgage debt by pulling a credit report for each borrower or a joint report for a married couple. The servicer must also consider information obtained from the borrower orally or in writing concerning incremental monthly obligations.<br><br>Borrowers who otherwise qualify for a modification under this program, but who would have a post-modification Back-End DTI greater than or equal to 55%, will be provided with a letter stating that they are required to work with a HUD-approved counselor and the modification will not take effect until they provide a signed statement indicating that they will obtain counseling. |
| **Reasonably Foreseeable / Imminent Default:** | Every potentially eligible borrower who calls or writes in to their servicer in reference to a modification must be screened for hardship. This screen must ascertain whether the borrower has had a change in circumstances that causes financial hardship, or is facing a recent or imminent increase in the payment that is likely to create a financial hardship (payment shock). If the borrower reports a material change in circumstances, the servicer must ask about current income and assets, and current expenses as well as the specific circumstances relating to the claimed financial hardship. Each of these elements shall be verified through documentation.<br><br>If the servicer determines that a non-defaulted borrower facing a financial hardship is in Imminent Default and will be unable to make his or her mortgage payment in the immediate future, the servicer must apply the NPV Test. |
| **Required Modifications and Optional Modifications:** | A standard NPV Test will be required on each loan that is in Imminent Default or is at least 60 days delinquent under the MBA delinquency calculation. This NPV Test will compare the net present value (NPV) of cash flows expected from a modification to the net present value of cash flows expected in the absence of modification. If the NPV of the modification scenario is greater, the NPV result is deemed positive.<br><br>The NPV Test applies to the Standard Waterfall only and does not require consideration of principal forgiveness. However, the servicer may choose to forgive principal if the servicer determines that principal forgiveness improves the likelihood of loan performance and the value of modification. Required parameters for the NPV Test will be published separately. |

If the NPV Test generates a positive result when applying the Standard Waterfall, the servicer is required to offer a Home Affordable Modification to the borrower.  If the NPV Test generates a negative result, modification is optional, unless prohibited under contract.  The monthly payment reduction incentive is available for any Home Affordable Modification, whether or not NPV positive, that meets the eligibility requirements and is performed according to the waterfall described below.

If the NPV Test result is negative and a Home Affordable Modification is not pursued, the lender/investor must seek other foreclosure prevention alternatives, including alternative modification programs, deed-in-lieu and short sale programs.

## Loan Modification and Standard Waterfall

| | |
|---|---|
| **Overview:** | Servicers will follow the Standard Waterfall described below to reduce monthly payments to the 31% Front-End DTI Target defined above.  The initiative will reimburse lenders/investors for one half of the cost of reducing monthly payments from a level consistent with a 38% Front-End DTI Ratio (or less, if the unmodified DTI is less than 38%) down to a level consistent with a 31% Front-End DTI Ratio.  This Payment Reduction Cost Share can last for up to five years. |
| **Hope for Homeowners:** | Servicers will be required to consider a borrower for refinancing into the Hope for Homeowners program when feasible.  Servicer incentive payments will be paid for Hope for Homeowner refinances.<br><br>If the underwriting process for a Hope for Homeowners refinance would delay eligible borrowers from receiving a modification offer, servicers will use the Standard Waterfall to begin the Home Affordability Modification and work to complete the Hope for Homeowners refinance during the Trial Modification Period.<br><br>Consideration for a Hope for Homeowners refinance should not delay eligible borrowers from receiving a modification offer and beginning the Trial Modification Period. |
| **Standard Waterfall Process:** | Step 1a: Request Monthly Gross Income as specified above.<br><br>Step 1b: Validate total first lien debt and monthly payments (PITIA).  For |

purposes of making a provisional modification offer during the trial modification period, the borrower's unverified income and debt payments can be used. Provisional information and modification terms will be verified in a timely manner.

Step 2: Capitalize arrearage. Servicers may capitalize accrued interest, past due real estate taxes and insurance premiums, delinquency charges paid to third parties in the ordinary course of servicing and not retained by the servicer, any required escrow advances already paid by the servicer and any required escrow advances by the servicer that are currently due and will be paid by the servicer during the Trial Period. Late fees are not capitalized.

Step 3: Target a Front-End DTI of 31%. The lender/investor shall follow steps 4, 5, and 6 to reduce the borrower's payment to the level corresponding to the Front-End DTI Target.

Step 4: Reduce the interest rate to reach the Front-End DTI Target (subject to a floor of 2%). The note rate should be reduced in increments of 0.125 %, and should bring the monthly payment as close as possible to the Front-End DTI Target without going below 31%. If the resulting modified interest rate is at or above the Interest Rate Cap, this modified interest rate will be the new note rate for the remaining loan term. If the resulting modified interest rate is below the Interest Rate Cap, this modified interest rate will be in effect for the first five years, followed by annual increases of 1% (100 basis points) per year or such lesser amount as may be needed until the interest rate reaches the Interest Rate Cap, at which time it will be fixed for the remaining loan term.

Step 5: If the Front-End DTI Target has not been reached, extend the term of the loan up to 40 years. If term extension is not permitted extend amortization. The 40-year term begins at the start of the modification (after the borrower successfully completes the Trial Period). Note that the servicer should only extend to a term that is necessary to reach the Front-End DTI Target; there is no requirement to extend to a 40-year term.

Step 6: If the Front-End DTI Target has not been reached, forbear principal. If there is a principal forbearance amount, a balloon payment of that forbearance amount is due on the maturity date, upon sale of the property, or upon payoff of the interest bearing balance. If the modification does not pass the NPV Test and the servicer chooses to modify the loan, the modified balance must be no lower than the current property value.

| Principal Reduction Option: | There is no requirement to use principal reduction under the Home Affordable Modification program; however, servicers may forgive principal to achieve the Front-End DTI Target.

Principal forgiveness can be used on a standalone basis or before any step in the Standard Waterfall process. If principal forgiveness is used, subsequent steps in the Standard Waterfall may not be skipped. If principal is forgiven and the rate is not reduced, the rate will be frozen at its existing level and treated as a modified rate for the purposes of the Interest Rate Cap.

In the event of principal forgiveness, the Payment Reduction Cost Share continues to be based on the change in the borrower's monthly payment from 38% to 31% Front-End DTI ratio and is limited to five years. |
|---|---|

## Modification Terms

| Interest Rate Floor: | The Interest Rate Floor for modified loans is 2%. |
|---|---|
| Interest Rate Cap: | The modified interest rate must remain in place for five years, after which time the interest rate will be gradually increased 1% (100 basis points) per year or such lesser amount as may be needed until it reaches the Interest Rate Cap.

The Interest Rate Cap for the modified loan is the lesser of (i) the fully indexed and fully amortizing original contractual rate or (ii) the Freddie Mac Primary Mortgage Market Survey rate for 30-year fixed rate conforming mortgage loans, rounded to the nearest 0.125%, as of the date that the modification document is prepared.

If the modified rate exceeds the Freddie Mac Primary Mortgage Market Survey rate in effect on the date the modification document is prepared, the modified rate will be the new note rate for the remaining loan term. |

| Principal Forbearance: | No interest will accrue on the forbearance amount. |
|---|---|
| | If the option to forebear principal is selected, the servicer shall forbear on collecting the deferred portion of the Capitalized Balance until the earliest of (i) the maturity of the modified loan, (ii) a sale of the property, or (iii) a pay-off or refinancing of the loan. |
| Redefaulting Loans: | A loan will be considered to have redefaulted when the borrower reaches a 90-day delinquency status under the MBA delinquency calculation. Redefaulting Loans will be terminated from the program, and no further payments of any kind will be made to the lender/investor, servicer, or borrower. Redefaulting Loans should be considered for other loss mitigation programs prior to being referred to foreclosure. |

## Approval Conditions

| Trial Period Required: | Successful completion of the trial modification period and entry into program agreements between the servicer and Treasury's financial agent are prerequisites for any payments to the lender/investor, servicer, or borrower. |
|---|---|
| | Modification is effective the first calendar month following the successful completion of the Trial Period. Successful completion means that the borrower is current (under the MBA delinquency calculation) at the end of the Trial Period. |
| | Borrowers in foreclosure restart states will be considered to have failed the Trial Period if they are not current at the time the foreclosure sale is scheduled. |
| | No payments under the program to the lender/investor, servicer, or borrower will be made during the Trial Period. No payments under the program to the lender/investor, servicer, or borrower will be made if the Trial Period is not completed successfully. No payments under the program to the lender/investor, servicer, or borrower will be made unless and until the servicer has entered into the program agreements with Treasury's financial agent. |
| Length of Trial Period: | The Trial Period will last 90 days (three payments at modified terms) or longer if necessary to comply with investor contractual obligations. The |

9

| | borrower must be current at the end of the Trial Period to obtain a Home Affordable Modification. |
|---|---|
| Escrows: | Servicers are required to escrow for modified borrowers' real estate taxes and mortgage-related insurance payments immediately if they have the capability of processing these payments or are already using a third-party vendor for this purpose. Servicers who do not have this capacity must implement an escrow process within six months of the program agreement. |
| Counseling Requirements: | For borrowers with a Back-End DTI of 55% or higher, the servicer must inform the borrower of the availability and advantages of counseling and provide a list of local HUD-approved counselors. The servicer must provide the borrower with a letter stating that counseling is a requirement of the modification terms. This letter may be required by counselors in order to begin counseling. The modification will not take effect until the borrower represents in writing that he or she will obtain counseling. |
| Assumable: | If the modified loan was assumable prior to modification, a Home Affordable Modification cancels this feature. |

## Fees/Charges

| Modification Fees and Charges to Borrower: | There are no modification fees or charges borne by the borrower. |
|---|---|
| Modification Fees and Charges Reimbursable by Investor: | Modification fees and charges to the servicer will be reimbursable by the investor. These include notary fees, property valuation and other required fees. Servicer reimbursement by the investor will take place within the normal process between the servicer and the investor. |
| Unpaid Late Fees Waived: | Unpaid late fees will be waived for the borrower. These include late fees prior to the start of the Trial Period and accrued during the period. |
| Credit Report: | The servicer will cover the cost of the credit report. |

## Compensation

| | |
|---|---|
| **Servicer Compensation:** | Compensation is provided to the servicer that performs the loss mitigation or modification activities.  Upon modification following successful completion of the Trial Period, and contingent on signing the program servicer agreement, the servicer will receive an incentive fee of $1,000 for each eligible modification meeting Home Affordable Modification guidelines.<br><br>Servicers will also receive Pay for Success fees – payable 12 months from the effective date of the Trial Period as long as the borrower continues in the program – of up to $1,000 each year for three years.  Servicers will no longer receive Pay for Success incentive payments for Redefaulting Loans or for loans that have paid off subject to certain *de minimis* constraints (discussed below).<br><br>For loans modified while still current under the MBA delinquency calculation, the servicer will receive a Current Borrower One-Time Incentive of $500 following successful completion of the Trial Period.<br><br>Lenders that service their own loans are eligible for these incentives.  Throughout this document the term "servicer" means the party that is responsible for performing the modification activities.<br><br>Similar incentives will be paid for Hope for Homeowner refinances. |
| **Borrower Cash Contribution:** | The investor may not require the borrower to contribute cash. |
| **Lender/Investor Compensation:** | Lenders/investors will be compensated only in the event that the Front-End DTI Target or a lower Front-End DTI is achieved.  Lenders/investors will follow the Standard Waterfall specified above to reach a monthly payment that satisfies the Front-End DTI Target.  As described above, Treasury will provide compensation based on one half of the dollar difference between the monthly payment for a 31% Front-End DTI Ratio and the lesser of (i) the monthly payment for a 38% Front-End DTI Ratio or (ii) the borrower's current monthly payment.  This compensation will be provided for up to five years or until the loan is paid off.<br><br>Upon a modification becoming effective following successful completion of the Trial Period by a borrower who was current prior to the start of the Trial Period, lenders/investors will be paid a $1,500 Current Borrower One-Time Incentive,  subject to certain *de minimis* constraints (discussed below). |

11

| | |
|---|---|
| | No monthly lender/investor payments will be made during the Trial Period.  Monthly lender/investor payments will begin after the Trial Period is successfully completed, the servicer signs a service agreement with Treasury, and formal modification begins.  No monthly lender/investor payments will be made if the Trial Period is not completed successfully. |
| **Borrower Compensation:** | Borrowers will be eligible to accrue up to $1,000 each year in Pay-for-Performance Success Payments for up to five years, a total of up to $5,000 over five years, subject to certain *de minimis* constraints (discussed below).  Accruals are based on on-time payment performance.  The first annual principal balance reduction will be effective 12 months after entering the Trial Period as long as the borrower is not terminated from the program.  In any given month, the borrower's mortgage payment must be made on time, accounting for standard servicer grace periods, in order to accrue the monthly Pay for Performance Success Payment.  The borrower will receive information on a monthly basis regarding the accrual of these payments.

The payment will be directed to the servicer, who will reduce the principal balance by the payment amount (but not by more than $1,000 per year) for five years if the borrower continues in the program.  Payments are to be applied directly and entirely to reduce the principal balance, and any applicable prepayment penalties on partial principal prepayment made by the government must be waived.  The equivalent of three months of Pay-for-Performance Success Payments will be made upon successful completion of the Trial Period, contingent upon the servicer signing a service agreement with the Treasury.

Borrowers who are terminated from the program lose their right to outstanding accruals. |
| ***De Minimis* Constraint:** | To qualify for servicer Pay for Success payments and borrower Pay for Performance Success Payments, the modification must reduce the monthly payment by a minimum of 6 %.  The monthly payment is the PITIA payment, as used in defining DTI, with the loan fully indexed and fully amortized.

When paid, servicer annual Pay for Success payments and borrower Pay for Performance Success Payments will be the lesser of (i) $1,000 or (ii) half the reduction in the borrower's annualized monthly payment.

The *de minimis* constraint does not apply to the up-front Servicer |

| | |
|---|---|
| | Incentive Payment, the Payment Reduction Cost Share, or the Home Price Depreciation Reserve Payment. |

## Consumer Protection

| | |
|---|---|
| Disclosure | When promoting or describing loan modifications, servicers should provide borrowers with information designed to help them understand the modification terms that are being offered and the modification process. Servicers also must provide borrowers with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions. |
| Fair Lending | Servicers' modifications under this program must comply with the Equal Credit Opportunity Act and the Fair Housing Act, which prohibit discrimination on a prohibited basis in connection with mortgage transactions.  Loan modification programs are subject to the fair lending laws, and servicers and lenders should ensure that they do not treat a borrower less favorably than other borrowers on grounds such as race, religion, national origin, sex, marital or familial status, age, handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit redlining. |
| Consumer Inquiries and Complaints | Servicers should have procedures and systems in place to be able to respond to inquiries and complaints relating to loan modifications.  Servicers should ensure that such inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution. |

## Monitoring

| | |
|---|---|
| Documentation: | Servicers will be required to maintain records of key data points for verification/compliance reviews.  These documents may include, but are not limited to, borrower eligibility and qualification, underwriting criteria, and incentive payments.  These documents also include a hardship affidavit, which every borrower is required to execute.

Borrowers will be required to provide declarations under penalty of perjury attesting to the truth of the information that they have provided to the servicer to allow the servicer to determine the borrower's eligibility for entry into the Home Affordable Modification Program. |

| | Detailed guidance on data requirements will be released separately. |
|---|---|
| **Anti-Fraud Measures:** | Measures to prevent and detect fraud, such as documentation and audit requirements, will be described in the servicer guidelines and the program guidelines in the financial agency agreements with Fannie Mae and Freddie Mac.  Additional fraud protection measures will be announced by Treasury.<br><br>Participating servicers and lenders/investors are not required to modify the loan if there is reasonable evidence indicating the borrower submitted false or misleading information or otherwise engaged in fraud in connection with the modification.  Servicers should employ reasonable policies and/or procedures to identify fraud in the modification process. |
| **Data Collection:** | Servicers will be required to collect and transmit borrower and property data in order to ensure compliance with the program as well as to measure its effectiveness.  Data elements may include data needed to perform underwriting analysis, loan modification and waterfall analysis, and modification terms.  In addition, borrower profiles and property level information may be included.  Detailed guidance on data requirements will be released separately. |
| **Accounting and Legal:** | The provisions of the Program should not be construed to override, void or in any way modify  the responsibility of the management of lenders and servicers for preparing financial statements and regulatory reports in accordance with all applicable generally accepted accounting principles, including standards such as Statement of Financial Accounting Standards (SFAS) No. 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings,* SFAS No. 114, *Accounting by Creditors for Impairment of a Loan,* SFAS No. 133, *Accounting for Derivative Instruments and Hedging* Activities, SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,* and AICPA Statement of Position 03-3, *Accounting for Certain Loans or Debt Securities Acquired in a Transfer,* and their related amendments and interpretations. |

## Other Program Features

| | |
|---|---|
| **Home Price Depreciation Payments:** | To encourage lenders/investors to modify more mortgages, compensation will be provided to partially offset probable losses from home price declines.  This will be structured as a simple cash payment on each modified loan while the loan remains active in the program. |

| | |
|---|---|
| **Payments for Short Sales and Deeds-in-Lieu:** | Compensation will be provided to servicers and borrowers in order to facilitate short sales or deeds-in-lieu in those cases in which borrowers either fail the net present value (NPV) test (described below) or fail to qualify for, or default under, the modification program. |
| **Second Lien Elimination Payments:** | To reduce the borrower's overall indebtedness and improve loan performance, additional incentives will be provided to extinguish junior liens on homes with first-lien loans that are modified under the program. |
| **Government Loan Programs:** | FHA, VA and rural housing loans will be addressed through standalone modification programs run by those agencies.  FHA's Hope for Homeowners refinancing program will also be included in a parallel incentive program. |

# Net Present Value Model Parameters

| | |
|---|---|
| **NPV Test:** | An NPV Test will be required on each loan that is in Imminent Default or is at least 60 days delinquent under the MBA delinquency calculation. This NPV test will compare the net present value (NPV) of cash flows expected from a modification to the net present value of cash flows expected in the absence of modification.  If the NPV of the modification scenario is greater, the NPV result is deemed positive, and the servicer must modify the loan (absent fraud, etc.)  However, an "NPV positive" result is not necessary to qualify a loan for a Home Affordable Modification and the associated lender/investor, servicer, and borrower payments. |
| **Standard NPV Model:** | To provide a consistent and industry-wide approach to the required NPV Tests, Treasury will set forth a Standard NPV Model with parameters specified below.  Complete details on each component outlined below are forthcoming. |
| **Discount Rate:** | The program allows the servicer to choose the Discount Rate to use in the NPV Model, subject to a program-determined ceiling that will be sensitive to the market-determined cost of funds.  The ceiling on the allowable Discount Rate for the NPV Test is the Freddie Mac Primary Mortgage Market Survey rate (PMMS), plus a spread of 2.5 percentage points.  The PMMS is the conventional mortgage rate published in the Federal Reserve's H.15 bulletin.<br><br>The servicer may choose a different Discount Rate for loans in portfolio versus loans in investor pools, but may not otherwise apply different rates to different loans in the servicing book.  For example, it may choose to use a Discount Rate equal to the PMMS + 2.0 percent for its investor pools and a Discount Rate equal to the PMMS for its loans in portfolio. |
| **Cure Rate and Redefault Rate:** | The Cure Rates and Redefault Rates will be obtained from a default equation with parameters based on GSE analytics and program portfolio data except where servicers use custom parameters (see below).  Treasury, in consultation with an inter-agency team of government officials, will update these tables periodically based on incoming data. |
| **Property Value:** | Property value will be determined in accordance with the Guidelines. |

| | |
|---|---|
| **Incentive Payments:** | Incentive payments, including the Payment Reduction Cost Share, annual borrower performance bonus payments toward principal, and Current Borrower One-Time Bonus Incentive, will be determined in accordance with the Guidelines. |
| **Other Parameters:** | The remaining parameters will come from data sets held or produced by the Federal Housing Finance Agency: home price forecast, valuation of the house price depreciation reserve, foreclosure timelines, and foreclosure costs and REO stigma |
| **NPV Test Customization:** | Servicers having at least a $40 billion servicing book will have an option to substitute a set of Cure Rates and Redefault Rates estimated based on the experience of their own aggregate portfolios. A servicer using this option should take into account, as feasible, current LTV, current DTI, current credit score, delinquency status, and other relevant variables the servicer identifies.<br><br>The Cure and Redefault Rates must be empirically validated where possible. Servicer judgment regarding the effect of DTI is expected, given the limited data available and the likelihood that the new program will materially affect Cure and Redefault Rates. However, all assumptions must be tested as program data become available and revised as appropriate.<br><br>A servicer who chooses to use customized Cure and Redefault Rates must apply the same assumptions for Cure and Redefault Rate to the entire servicing portfolio, without distinguishing between loans in portfolio and investor pools.<br><br>Models and assumptions will be subject to review by federal bank supervisory agencies where applicable, and in all cases by Freddie Mac as program compliance agent.<br><br>A servicer not meeting the size threshold may apply for permission to apply Cure Rates and Redefault Rates estimated based on the servicer's portfolio experience. |
| **Mortgage Insurance:** | For loans that have mortgage insurance (MI) coverage, the NPV Test will incorporate the value of the contingent claim payment in the event of default when evaluating projected foreclosure or modification scenarios. If the modification does not pass the NPV Test, then it will be referred to the appropriate MI company. The major MI companies have agreed to develop a mechanism by which they will pay partial claims where they deem appropriate to avoid foreclosure. |

# Exhibit C

# LexisNexis®

1 of 1 DOCUMENT

Nichole Williams, Johnson Sendolo, Carey Koppenberg, Carrie Strohmayer, on behalf of themselves and all others similarly situated, Plaintiffs, v. Timothy F. Geithner, as United States Secretary of the Treasury, U.S. Department of the Treasury, The Federal Housing Finance Agency, as Conservator for the Federal National Mortgage Association, d/b/a Fannie Mae and the Federal Home Loan Mortgage Corporation, d/b/a Freddie Mac, Federal National Mortgage Association, d/b/a Fannie Mae, Federal Home Loan Mortgage Corporation, d/b/a Freddie Mac, Ocwen Loan Servicing, LLC, GMAC Mortgage, f/d/b/a Homecomings Financial, and U.S. Bank, Defendants.

Civil No. 09-1959 ADM/JJG

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

*2009 U.S. Dist. LEXIS 104096*

November 9, 2009, Decided
November 9, 2009, Filed

**COUNSEL:** [*1] For Nichole Williams, On behalf of themselves and all others similarly situated, Carey Koppenberg, On behalf of themselves and all others similarly situated, Carrie Strohmayer, On behalf of themselves and all others similarly situated, Johnson Sendolo, On behalf of themselves and all others similarly situated, Plaintiffs: Jane N Bowman, Housing Preservation Project, Inc, St Paul, MN; Mark R Ireland, Timothy L Thompson, Housing Preservation Project, St Paul, MN.

For Timothy F. Geithner, as United States Secretary of the Treasury, U.S. Department of the Treasury, Defendants: Bradley H Cohen, US Department of Justice, Washington, DC; Friedrich A P Siekert, United States Attorney's Office, Mpls, MN.

For Federal Housing Finance Agency, The, as conservator for the Federal National Mortgage Association, d/b/a Fannie Mae and the Federal Home Loan Mortgage Corporation d/b/a Freddie Mac, Defendant: Mark H Zitzewitz, LEAD ATTORNEY, Bryan R Freeman, Mark A Jacobson, Lindquist & Vennum PLLP, Mpls, MN; David B Bergman, Howard N Cayne, PRO HAC VICE, Arnold & Porter LLP, Washington, DC; Stephen E Hart, Federal Housing Finance Agency, Washington, DC.

For Federal Home Loan Mortgage Corporation, doing business [*2] as Freddie Mac, Defendant: Chante-NA Bowser, Hyacinth-NA G. Kucik, Not Admitted; Cooper S Ashley, Emily M Rome, Michael C McCarthy, Maslon Edelman Borman & Brand, LLP, Mpls, MN; Graham H Kidner, PRO HAC VICE, Federal Home Loan Mortgage Corporation, McLean, VA; Michael J Ciatti, PRO HAC VICE, King & Spalding, Washington, DC; Patrick S Williams, Briggs & Morgan, PA, Mpls, MN.

For Federal National Mortgage Association, doing business as Fannie Mae, Defendant: Kelly Thompson Cochran, Seth P Waxman, PRO HAC VICE, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC; Noah A Levine, PRO HAC VICE, Wilmer Cutler Pickering Hale & Dorr LLP, New York, NY; Patrick S Williams, Briggs & Morgan, PA, Mpls, MN.

For Ocwen Loan Servicing, LLC, Defendant: David A Applebaum, LEAD ATTORNEY, Leonard Street and Deinard, PA, Mpls, MN; Brian P Brooks, PRO HAC VICE, O'Melveny & Myers LLP, Washington, DC; Elizabeth Lemond McKeen, PRO HAC VICE, O'Melveny & Myers LLP, Newport Beach, CA.

For GMAC Mortgage, formerly doing business as Homecomings Financial, Defendant: David R Stras, Elea-

salo V Ale, Emily E Chow, Jennifer Y Dukart, Wendy J Wildung, Faegre & Benson LLP, Mpls, MN.

For U.S. Bank, Defendant: Christine L [*3] Nessa, Mark P Schneebeck, Oppenheimer Wolff & Donnelly LLP, Mpls, MN.

JUDGES: ANN D. MONTGOMERY, U.S. DISTRICT JUDGE.

OPINION BY: ANN D. MONTGOMERY

OPINION

MEMORANDUM OPINION AND ORDER

I. INTRODUCTION

On October 15, 2009, the undersigned United States District Judge heard oral argument on the Motion for Preliminary Injunction [Docket No. 2] of Plaintiffs Nichole Williams, Johnson Sendolo, Carey Koppenberg, and Carrie Strohmayer, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"). Counsel for Defendants Timothy F. Geithner ("Secretary") and the United States Department of the Treasury ("Treasury"), Defendant Federal Housing Finance Agency ("FHFA"), Defendant Federal National Mortgage Association, d/b/a Fannie Mae ("Fannie Mae"), Defendant Federal Home Loan Mortgage Corporation, d/b/a Freddie Mac ("Freddie Mac"), Defendant Ocwen Loan Servicing ("Ocwen"), and Defendant GMAC Mortgage, f/d/b/a Homecomings Financial ("Homecomings Financial") appeared in opposition to Plaintiffs' Motion. For the reasons set forth below, Plaintiffs' Motion for Preliminary Injunction is denied.

II. BACKGROUND

A. The HAMP Program

On October 3, 2008, Congress passed the Emergency Economic Stabilization Act (the [*4] "Act"). *12 U.S.C. § 5201 (2008)*. The Act allocated $ 700 billon to Treasury to restore liquidity and stability to the financial system; one of its goals was to "preserve homeownership." Id. The Act also established the Troubled Asset Relief Program, which was intended to reduce foreclosures. *12 U.S.C. §§ 5211, 5225 (2008). Sections 109* and *110* of Title I of the Act provide, in pertinent part:

*Section 109*. Foreclosure Mitigation Efforts.

a. RESIDENTIAL MORTGAGE LOAN SERVICING STANDARDS. To the extent that the Secretary acquires mortgages, mortgage backed securities, and other assets secured by residential real estate, including multifamily housing, the Secretary shall implement a plan that seeks to maximize assistance for homeowners and use the authority of the Secretary to encourage the servicers of the underlying mortgages, considering net present value to the taxpayer, to take advantage of the HOPE for Homeowners Program under section 257 of the National Housing Act or other available programs to minimize foreclosures. In addition, the Secretary may use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures.

. . . .

c. CONSENT TO REASONABLE [*5] LOAN MODIFICATION REQUESTS. Upon any request arising under existing investment contracts, the Secretary shall consent, where appropriate, and considering net present value to the taxpayer, to reasonable requests for loss mitigation measures, including term extensions, rate reductions, principal write downs, increases in the proportion of loans within a trust or other structure allowed to be modified, or removal of other limitation on modifications.

. . . .

*Section 110*. Assistance to Homeowners.

. . . .

IN GENERAL. To the extent that the Federal property manager holds, owns, or controls mortgages, mortgage backed securities, and other assets secured by residential real estate, including multifamily housing, the Federal property manager shall implement a plan that seeks to maximize assistance for homeowners and use its authority to encourage the servicers of the underlying mortgages, and considering net present value to the taxpayer, to take advantage of the HOPE for Homeowners Program under section 257 of the National Housing Act or other available programs to minimize foreclosures.

Enabled with this authority, Treasury, FHFA, Fannie Mae, and Freddie Mac created the Making Home Affordable [*6] Program on February 18, 2009, which consists of two components: (1) the Home Affordable Refinance Program, and (2) the Home Affordable Modification Program (the "HAMP"), the program at issue in this dispute.

The HAMP is aimed to financially assist three to four million homeowners who have defaulted on their mortgages or who are in imminent risk of default by reducing monthly payments to sustainable levels. Bowman Aff., [Docket No. 9], Ex. B at 1 (Treasury Supplemental Directive 09-01 describing the HAMP and eligibility requirements, hereinafter referred to as "SD 09-01"). The HAMP works by providing financial incentives to participating mortgage servicers [1] to modify the terms of eligible loans. See Maggiano Decl. [Docket No. 83] P 16. Treasury provides guidance to servicers by defining the class of borrowers who are eligible for a loan modification and setting forth specific modification protocols. SD 09-01 at 2, 8-10.

[1]   Mortgages that are owned, securitized, or guaranteed by Fannie Mae or Freddie Mac, as well as mortgages owned by private servicers, may participate in the HAMP. Servicer participation is voluntary.

Treasury Guidelines specify several "threshold criteria" [2] to define the   [*7] class of eligible borrowers:

. The loan is a first-lien mortgage originated on or before January 1, 2009;

. The loan is secured by a one-to-four unit property, one unit of which is the borrower's principal residence;

. The property has not been abandoned or condemned;

. The current unpaid principal balance is no greater than specified limits ($ 729,750 for a one-unit property)

. The loan is delinquent or default is reasonably foreseeable;

. The borrower has a monthly mortgage payment greater than 31 percent of monthly income, and has insufficient assets to make the payment; and

. The borrower documents a financial hardship.

SD 09-01, at 2-3.

[2]   The eligibility criteria for mortgages owned by Fannie Mae or Freddie Mac are generally consistent but vary slightly from the criteria for mortgages owned by private servicers because Fannie Mae and Freddie Mac can authorize modifications that a servicer may not have authority to approve. There are additional criteria not included in the above list.

If the borrower meets the threshold criteria, the Treasury Guidelines enumerate a sequence of steps (the "waterfall") servicers must apply, in the prescribed order, to achieve a "target monthly mortgage payment,"   [*8] defined as 31 percent of the borrower's gross monthly income. SD 09-01 at 8-10. The waterfall sequence requires servicers to first determine the total debt by capitalizing certain costs (delinquent interest, taxes, insurance escrows, and third party fees) in the unpaid principal balance and then to (1) reduce the interest rate in increments of .125 percent down to a 2.0 percent floor, (2) extend the term and reamortize the loan by up to 480 months from the effective date of the modification, (3) forbear (but not forgive) a portion of the principal, and transform it into a balloon payment that must be paid either at maturity or upon payoff. Id.

The Treasury Guidelines explain that "participating servicers are required to consider all eligible mortgage loans unless prohibited by the rules of the applicable [pooling and servicing agreement] and/or other investor servicing agreements." Id. at 1. The Guidelines provide:

All loans that meet the [HAMP] eligibility criteria and are either deemed to be in imminent default (as described above) or 60 or more days delinquent must be evaluated using a standardized NPV [net present value] test [3] that compares the NPV result for a modification to the   [*9] NPV result for no modification. If the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed 'positive' and the servicer MUST offer the modification. If the NPV result for no modification is greater than NPV result for the modification scenario, the modification result is deemed 'negative' and the servicer has the option of performing the modification in its discretion.

Id. at 4. Therefore, although an applicant may be eligible in the sense of meeting the threshold criteria, servicers are not required to modify a loan with a negative NPV or if otherwise prohibited by the investor.

> 3   The NPV is essentially an accounting calculation to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure. See generally, Exhibit 4, Base NPV Model Overview. The calculation compares the probability that the mortgage defaults and the estimated loss to the servicer given foreclosure with the cash flow generated if the loan is modified. See id. at 2-3. Servicers are permitted to customize the NPV model to fit their unique loan portfolios. Id. at 1.

If the loan qualifies for a modification after consideration [*10] of all the aforementioned factors, the servicer is obligated to provide a trial period loan modification. Id. If the borrower remains current throughout the trial period, the servicer must then provide a loan modification. Id. at 17-18.

The Treasury Guidelines advise borrowers denied loan modifications to contact servicers who "must also have procedures and systems in place to be able to respond to inquiries and complaints about the [HAMP]. Servicers should ensure that such inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution." Id. at 13. Specifically, borrowers denied a loan modification can contact the Homeowner's HOPE Hotline and speak with a trained housing counselor regarding the HAMP program. Maggiano Decl. P 37. If the counselor believes that the borrower's application was improperly denied, the counselor can refer the concern to the servicer's senior-level management. See id. PP 37-39. If that senior-level official cannot resolve the issue, the counselor can further escalate the case to a designated team at Fannie Mae whose responsibility includes resolving individual and systemic problems. See id. P 39. In addition, to [*11] monitor participating servicers' compliance with the HAMP, Freddie Mac, at the direction of Treasury, instituted a second-look process in which it audits a sample of loan modification applications that have been denied to minimize the likelihood that borrower applications are overlooked or inadvertently denied. Id. P 31. Finally, in response to growing concerns about the servicers' failure to provide adequate reasons for a loan modification denial, the Secretary of the Treasury issued SD 09-06 which requires, in part, servicers to furnish Treasury and Fannie Mae with the specific reason for denial. [4] Attachment to Memo in Opposition filed by Treasury [Docket No. 106], Ex. 5 at 16.

> 4   Treasury Supplemental Directive 09-06 enumerates 13 reasons for a loan modification denial. Each reason corresponds to a code that specifies why a borrower was not offered or accepted into a trial plan. These codes were expected to become functional on or about October 1, 2009. At oral argument, Treasury's counsel indicated he believed these codes were operational.

## B. The Parties

The United States Department of the Treasury, through its Secretary, is the executive agency responsible for promulgating the rules [*12] of the federal program at issue in this case. FHFA is a federal agency that supervises and regulates housing finance and also serves as the Conservator for Fannie Mae and Freddie Mac. Fannie Mae and Freddie Mac are private companies chartered by Congress that support the secondary mortgage market by purchasing residential mortgages from private mortgage lenders and then holding or selling those mortgages. Ocwen and Homecomings Financial are private loan servicers. Defendants are referred to individually by name and collectively as "Defendants."

Plaintiff Nichole Williams ("Williams") purchased a home in 2004 and refinanced her mortgage the following year. Williams Aff. [Docket No. 6] P 2. She was employed as a legal assistant but was laid-off in 2007. Id. at P 6. Unable to make her monthly mortgage payment, Williams contacted the servicer of her mortgage, Homecomings Financial. She requested but was denied a loan modification pursuant to the HAMP. See id. at PP 10, 23. Although her mortgage is delinquent, Homecomings Financial has not initiated foreclosure proceedings. See id. at P 25. Williams purports to represent a class of people who are delinquent on their mortgage payments, have [*13] applied for and been denied a loan modification, but whose loan servicers have not yet taken foreclosure action.

Plaintiff Johnson Sendolo ("Sendolo") purchased a home in 2005. Sendolo Aff. [Docket No. 5] P 2. In September 2008, he lost his job and ceased making mortgage payments several months later. Id. at PP 7-9. He contacted Ocwen, the servicer of his mortgage, seeking a loan modification pursuant to the HAMP, but his request was denied. Id. at PP 10, 13. On June 25, 2009, Sendolo's home was sold at a Sheriff's sale. Id. at P 18. Sendolo has until December 25, 2009, to redeem the property by paying the loan balance in full; his failure to do so will result in Ocwen reclaiming the property. See *Minn. Stat. §§ 581.10, 581.12* (2008). Sendolo purports to represent a class of people who are delinquent on their mortgage payments, have applied for and been denied a loan modification, and whose homes have been sold at a foreclo-

sure sale and whose statutory right of redemption period has not yet expired.

## C. Plaintiffs' Claims

Having been denied loan modifications, Plaintiffs Williams and Sendolo allege a violation of their constitutional right to procedural due process. Plaintiffs argue that [*14] the history and requirements of the HAMP demonstrate that Congress intended to provide a particular benefit to homeowners facing foreclosure, and, therefore, Defendants are required to provide that benefit in accordance with Plaintiffs' constitutional rights. Specifically, Plaintiffs contend that Defendants' failure to provide written notification of an adverse decision and an opportunity for appeal deprives them of due process of law in violation of the United States Constitution. Plaintiffs seek an injunction of all foreclosures by Defendants in Minnesota until the HAMP's constitutional infirmities are resolved.

## III. DISCUSSION

### A. Preliminary Injunction

The Eighth Circuit held in *Dataphase Systems, Inc. v. C L Systems, Inc.* that a district court deciding a motion for a preliminary injunction must balance four factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between the harm to the movant and the harm that the relief would cause to the other litigants; and (4) the public interest. *640 F.2d 109, 114 (8th Cir. 1981)* (en banc). "A preliminary injunction is an extraordinary remedy, [*15] and the burden of establishing the propriety of an injunction is on the movant." *Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003)* (citation omitted).

### 1. Likelihood of Success on the Merits

When considering whether to grant a preliminary injunction seeking to stay government action taken in the public interest pursuant to a statute or regulatory scheme, courts require "a substantial likelihood" rather than merely a "fair chance" that the moving party will prevail on the merits. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, 530 F.3d 724, 731-32 (8th Cir. 2008)* (en banc) (citing *Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995))*. This rigorous standard reflects the notion "that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able, 44 F.3d at 131*. Once the moving party satisfies its threshold showing likelihood of success on the merits, only then should courts consider

the other Dataphase factors. See *Planned Parenthood, 530 F.3d at 732*.

To prevail on their due process claim, Plaintiffs must [*16] first show a deprivation of a protected liberty or property interest. See *Board of Regents of State Colleges v. Roth, 408 U.S. 564, 570, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)*. Plaintiffs argue that the HAMP provides two benefits that constitute property interests: (1) the temporary suspension of foreclosure pending a determination on the homeowner's loan modification application and, (2) the right to receive a loan modification. If these benefits are protected property interests, the protections of due process apply. See *id. at 570-71*.

The Roth court explained that a protected property interest arises if a person has

> more than an abstract need or desire for [a benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.

*Id. at 577*. Such entitlements "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those [*17] benefits." Id. When a statute or policy grants to the decisionmaker discretionary authority in its implementation, a protected property interest is not created. *Jennings v. Lombardi, 70 F.3d 994, 996 (8th Cir. 1995)*.

The relevant "rules or understandings" here are the Act, the Treasury Guidelines, the contracts between and among the Defendants, and Minnesota foreclosure law. Plaintiffs argue that these rules and understandings use mandatory language and impose significant, substantive restrictions on a servicer's decision-making authority so as to create a protected property interest. Specifically, Plaintiffs rely on (1) the language in *12 U.S.C. § 5219 (c)*, which states, "the Secretary shall consent, where appropriate, and considering net present value to the taxpayer, to reasonable requests for loss mitigation measures" and (2) the provisions in the Treasury Guidelines circumscribing the servicers' ability to change elements of the NPV calculation.

For a number of reasons, the Court concludes the regulations at issue here did not intend to create a property interest in loan modifications for mortgages in de-

fault. First, the statute does not create an absolute duty on the part of the [*18] Secretary to consent to loan modifications; it is not "language of an unmistakably mandatory character." *Hill v. Group Three Housing Development Corp.*, 799 F.2d 385, 392 (1986) (describing rules or understandings that may create a protected property interest) quoting *Hewitt v. Helms*, 459 U.S. 460, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983). Notably, the statute provides that loans may be modified "where appropriate" - a phrase that limits the Secretary's obligation and evinces a Congressional intent to afford discretion in the decision whether to modify loans in certain circumstances.

Next, Congress dictated that requests for loan modifications necessarily consider the NPV to the taxpayer. Thus loan modifications are not an entitlement, but are linked to decisions that result in profits to taxpayers. Congress did not intend to mandate loan modifications. [5]

> 5    The statements by members of Congress who felt that the HAMP did not go far enough underscore this point: "[t]he central flaw of [EESA] is that there are no stronger protections for homeowners and no changes in the language to ensure that the secretary has the authority to compel mortgage servicers to modify the terms of mortgages . . . . We could have demanded language [*19] in the legislation that would have empowered the Treasury to compel mortgage servicers to rework the terms of mortgage loans so homeowners could avoid foreclosure." 154 Cong. Rec. H10766 (statement of Rep. Kucinich); and "*section 109* . . . should be changed from 'shall encourage' to 'shall require' to provide stronger relief for Americans. Specifically, current *section 109(a)* states in pertinent part that the 'the Secretary shall implement a plan that seeks to maximize assistance for homeowners and use the authority of the Secretary to encourage the servicers of the underlying mortgages . . . to minimize foreclosures.' I believe if the true intent is to bailout 'Main Street,' the Secretary should be 'required' to minimize foreclosures. 154 Cong. Rec. H10778 (statement of Rep. Jackson-Lee).

Third, regulations promulgated by Treasury for administering the HAMP clearly demonstrate that the Secretary allowed the exercise of some discretion, including calculation of the NPV, to the servicers. The calculation of the NPV is obviously not left to the servicers' unfettered discretion; the Treasury Guidelines' language circumscribing the extent of the servicers' discretion to define some elements [*20] of the NPV calculation is not alone sufficient to create a property interest in light of the broad discretion afforded to servicers in the modification process. See *Hill*, 799 F.2d at 391.

Among the variables servicers must use to calculate the NPV are the discount rate (an interest rate used to convert future payment or receipts into present value), the default rate (the rate at which borrowers default on the loan), and the re-default rate (the rate at which borrowers default after a loan modification). Servicers have considerable discretion in deciding what values to assign to these rates. The Federal Deposit Insurance Corporation's (FDIC) Loan Modification Program guidelines cited by Plaintiffs indicate that these variables are "servicer and/or portfolio specific." Second Ireland Aff. [Docket No. 98]; Ex. A at 14. Further evidence of the discretionary intent afforded servicers is found in the Treasury Guidelines. For example, they provide that "[d]efault rates may vary significantly from one large servicer to another based on differences in their portfolios. Therefore, allowing servicers *flexibility* to use rates that reflect their own portfolio experience should result in more accurate [*21] evaluations of proposed modifications." Attachment to Memo in Opposition filed by Treasury [Docket No. 106], Ex. 4 at 4 (emphasis added). They further state that "[i]n the base NPV model, all servicers are permitted *limited discretion* to adjust the discount rate by up to 250 basis points because different investors may place different values on future payments versus payments received today." Id. (Emphasis added). While Plaintiffs may be correct that the NPV calculation is merely an objective mathematical formula, assigning values to certain variables within the formula are largely within each servicers' discretion, rather than significantly and substantively constrained.

And finally, a finding of no protected property interest recognizes the economic reality facing servicers. Loan servicers seek to maximize their investments, and in doing so, make profitability determinations between modification or foreclosure, based in part on predictions about an individual borrower's likelihood of default. If the Secretary prescribed the exact criteria all servicers must use to determine whether a loan has a positive NPV (and therefore should be modified if the other criteria are satisfied) then [*22] servicers may choose to forego participating in the HAMP program so that they are not forced to modify loans that do not make financial sense. While Congress required the Secretary to implement a plan to assist distressed homeowners, that plan not only made servicer participation voluntary, but also afforded to program participants discretion on several variables that impact the NPV determination.

Based on the above, Plaintiffs do not have a legitimate claim of entitlement to a loan modification. Thus, the HAMP does not provide Plaintiffs with a "protected

property interest," the denial of which must comport with due process protections.

## 2. Other Dataphase Factors

Having found no constitutionally protected property interest in loan modifications, Plaintiffs are unable to show any likelihood of success on the merits of their due process claim. Accordingly, the Court finds it unnecessary to assess the remaining Dataphase factors for injunctive relief. See *Planned Parenthood, 530 F.3d at 732.*

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, IT IS HEREBY ORDERED that:

> 1. Both parties' post-hearing submissions related to Treasury Supplemental Directive [*23] 09-08 ("SD 09-08") are received by the Court and are of record; [6]

> 2. Plaintiffs' Motion for Preliminary Injunction [Docket No. 2] is DENIED;

> 3. Because Plaintiffs' Motion for Preliminary Injunction seeks solely injunctive relief based on an alleged violation of procedural due process [7] and the Court denies such relief, the Amended Complaint [Docket No. 25] is DISMISSED.

6   SD 09-08 requires that borrowers "be informed in writing of the reasoning for servicer determinations regarding program eligibility." Plaintiffs acknowledge that SD 09-08 "resolves many of the procedural due process issues presented in this matter." Plaintiffs' November 6, 2009 letter. While the Court concludes that the HAMP as administered prior to the promulgation of SD 09-08 did not give rise to a constitutional violation, Treasury's issuance of SD 09-08 tends to alleviate the constitutional objections raised by Plaintiffs.

7   Plaintiffs' requested relief for costs and attorneys' fees under *28 U.S.C. § 2412 (2008)* requires them to be deemed a prevailing party which they are not given the Court's ruling. Thus, Plaintiffs' request for costs and attorneys' fees fails as well.

LET JUDGMENT BE ENTERED ACCORDINGLY.

BY  [*24] THE COURT:

/s/ Ann D. Montgomery

ANN D. MONTGOMERY

U.S. DISTRICT JUDGE

Dated: November 9, 2009.

ORIGINAL FILED THIS _____
DAY OF
JEANNE HIC FEB 1 0 2010
Clerk Superior Court
By _____
Deputy
Sheauhna Kelbaugh

1
2
3
4
5

GIL SHAW
Attorney & Counselor at Law
105 South Cortez
Second Floor
Prescott, Arizona 86303
928-443-9600
gshaw@peoplesrightslaw.com

6    Gil Shaw, SBN 009290
     Attorney for Plaintiff

7

8        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9               IN AND FOR YAVAPAI COUNTY

10

| | |
|---|---|
| **ANDREA MARKS, a single woman, Plaintiff,** | Case No. P1300 CV 2 0 1 0 0 0 0 2 3 5 |
| **Vs.** | |
| **BANK OF AMERICA a foreign corporation, FEDERAL NATIONAL MORTGAGE ASSOCIATION dba Fannie Mae, a Federally Chartered Corporation, BLACK CORPORATIONS 1-5, WHITE PARTNERSHIPS 1-5, JOHN DOES 1-5 AND JANE DOES 1-5, Defendants.** | **COMPLAINT** **(Breach Of Contract)** **(Declaratory And Injunctive Relief)** Trial by Jury is demanded. |

18   Plaintiff alleges:

19   1.   Plaintiff Andrea Marks (Marks) is a single woman, owning as her sole and

20        separate property, the real property and home located at 5267 North Stetson,

21        Prescott Valley, Arizona. (Property)

22   2.   Defendant Bank of America is upon information and belief is a foreign

23        Corporation, doing business in Yavapai County, Arizona.   Upon information

24        and belief, the original loan on Plaintiff's Property was underwritten or

25        otherwise backed by "Fannie Mae", a privately chartered lending institution and

26

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86103
928-443-9600

1   was originally issued by Countrywide Mortage. Bank of America is doing

2   business in Arizona and Yavapai County.  At all times relevant to this

3   complaint, Plaintiff has and continues to deal with Bank of America.

4   3.  Defendant Federal National Mortgage Association dba Fannie Mae is a

5       federally chartered corporation that upon information and belief claims title to

6       or rights to possession to Plaintiff's Property.

7   4.  All fictitiously named defendants are named upon information and belief that

8       others may be liable for the acts complained of herein and subject to the relief

9       sought by the Plaintiffs.  Upon their true identities being discovered, leave will

10      be sought to amend the complaint. .

11  5.  Bank of America is a participating financial institution under the "Home

12      Affordable Modification Act Program Guidelines" (Program) of March 4th,

13      2009, a U.S. Department of the Treasury Program designed to assist

14      homeowners in preventing foreclosure on their homes. Pursuant to the Program,

15      Bank of America is offered certain financial incentives to reduce homeowner's

16      monthly mortgage payments.

17  6.  Bank of America has assumed loans originally serviced or originating with

18      Countrywide Mortgage, a now defunct institution. Bank of America has

19      assumed ownership of Countrywide's assets and is now servicing loans

20      formally owned by Countrywide Mortgage.

21  7.  Upon information and belief, Bank of America has received financial

22      consideration and other incentives from the U.S. Government and state

23      governments to administer and modify Countrywide loans and assist

24      homeowners in loan modification.

25  8.  On or about, August 17th, 2009 Plaintiff Marks, by and through her authorized

26      agent, New York Financial, in reliance upon Bank of America's participation in

-2-

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

the Program, submitted an application for homeowner assistance to  Bank of America requesting modification of their loan.

9. The application was submitted and Marks was told on October 2nd, 2009 that she had qualified for assistance with a reduction by almost one-half of her mortgage payment.

10. While told verbally of the terms of the loan, Marks wanted to consider the offer. She did so and called Bank of America on October 3rd, 2009, to accept the offer and request the paper work. Bank of America attempted to take a payment that day pursuant to the loan modification, but was unable to process it.  Marks was told that she could send her first payment in with her signed loan modification documents that would be forthcoming within the next two weeks.

11. Two weeks went by and no paper work was sent from Bank of America to Marks.  She called to inquire about the status of the documents and was told that there could be more delay in getting the paper work to her for signature.

12. By the first of November, there was still no paper work from Bank of America and a foreclosure date was looming.  Bank of America personnel told Marks that the foreclosure had been "pushed out" and that the bank was still within some forty five day period to get the modification documents out to Marks.

13. Two more weeks went by and Marks called the bank again on November 14th, this time spending almost three hours on the phone.  Marks was ultimately told that there was a problem, but it was a bank error and Bank of America would fix it and get the documents to her.  Marks was also told that the foreclosure date was "pushed out" again.

14. Between October 3rd, 2009 and December 30th, 2009, Marks never received any communication or documents from the bank regarding the foreclosure proceedings other than verbal assurances that it had been "pushed" back.

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

15. Just prior to the Christmas holidays, Marks attempted to call Bank of America several times but due to extremely long wait periods, she was unable to make contact with anybody.

16. In January 14th, 2010, with no paper work still forthcoming from Bank of America, Marks was personally informed that her home had sold at a trustee's sale and that "Fannie Mae" was the new owner.

17. Pursuant to the Program, any request for consideration for alternative foreclosure prevention options should suspend any foreclosure action. If the homeowners are accepted into the Trial Program, foreclosure actions are suspended.

18. Upon Plaintiff's application to the Program, Defendant Bank of America, should have suspended any and all foreclosure action.  Defendant Bank of America is required to thus suspend foreclosure action as a recipient of incentive funds from the Program.

19. Plaintiff Marks meets all applicable guidelines for consideration of a loan modification and upon information and belief would qualify for assistance and modification of her loan with Bank of America.

20. Upon information and belief, Defendant Bank of America has purchased the Plaintiffs Loan from the originator at a substantial discount and thus has an incentive not to modify loans and otherwise proceed to foreclosure so that it owns the real property.

21. Plaintiff's application has never been denied, and was in fact verbally approved. Any foreclosure or trustee's sale should have been suspended pending the approval or at the very least written notification that the application was not approved.

-4-

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

**COUNT ONE**

**(BREACH OF CONTRACT)**

22. Plaintiffs re-allege all previous allegations as if fully set forth herein.

23. Plaintiff is a third party beneficiary of Defendant Bank of America's contractual obligations with the U.S. Treasury, and also has an existing contractual relationship that is now modified in part by the Home Affordable Program. Once Plaintiff undertakes, in good faith, to seek modification of her loan with Defendant Bank of America, Bank of America is required to act in good faith and process the application in timely fashion and in accordance with the Program guidelines and requirements.

24. At all times relevant to this complaint, Plaintiff has acted in good faith.

25. Plaintiff is eligible for loan modification but for the delay and bad faith acts of the Defendant Bank of America.

26. Plaintiff's ownership interest in her property is now at risk due to the lack of good faith, and the Bank of America not processing Plaintiff's HAMP application in accordance with guidelines and other regulations.

27. Failure to suspend the foreclosure proceedings per U.S. Treasury requirements has now resulted in a potential loss of Plaintiff Marks' home.

28. As a result of this breach contract and breach of good faith and fair dealing, Plaintiff will suffer severe economic loss, including but not limited to the loss of any her home, relocation costs, and other damages in amounts to be proven at trial, but in amounts less than $75,000.

29. Plaintiff is also an insurance broker, whose business may be severely affected by a foreclosure proceeding. Plaintiff also has her office located in her home. Moving or relocation will cause loss of business and additional expense but in amounts to be proven at trial but in amounts less than $75,000 dollars.

30. As the matter arises out of contract, Plaintiffs are entitled their reasonable attorney fees.

        Wherefore as to Count One, Plaintiffs ask the court for the following:

A.  For general and specific  damages in amounts to be proven at trial of breach of contract;

B.  For attorney fees and costs as the matter arises out of A.R.S. §12-341.01;

C.  For costs and other such relief as the court feels is just and equitable under the circumstances.

## COUNT TWO

## (REQUEST FOR TEMPORARY AND PRELIMINARY INJUNCTION AND DECLARATORY RELIEF)

31. Plaintiff re-alleges all previous allegations as if fully set forth herein.

32. Plaintiff's interest in her real property has been punitively foreclosed on by Bank of America and or the Federal National Mortgage Association.  Pursuant to the Home Affordable Act, Defendants are required to forebear or suspend any foreclosure proceedings against the Plaintiffs' property once Plaintiffs' have filed an application for assistance under the Program and that application has been acted upon.

33. Despite verbal assurances that Bank of America had approved a loan modification, Plaintiff Marks has no evidence that her application has been formally approved or denied.

34. Despite repeated assurances from the Defendant Bank of America that foreclosure proceedings were being "pushed back", such proceedings in fact occurred.

35. Plaintiff has now been notified that the Federal National Mortgage Association

.GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
103 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

1  has retained counsel and a demand has been made upon her to surrender her

2  home pursuant to A.R.S. §12-1173.01.

3  36. There is a strong likelihood that immediate, irreparable harm will be done to

4  Plaintiffs during litigation if the foreclosure proceedings and imminent eviction

5  proceedings are not stayed or otherwise vacated pending resolution of this case

6  on the merits.

7  37. Defendants are required to suspend foreclosure proceedings against the

8  Plaintiff during the pendency of Plaintiff's application for assistance under the

9  Program. Plaintiff is also entitled to a suspension of foreclosure proceedings if

10  any modification is offered. Plaintiff was repeatedly assured that a modification

11  was approved, but no paper work was ever sent despite repeated requests and

12  assurances that it would be.

13  38. As such, Plaintiff has a strong likelihood of prevailing on the merits of her

14  breach of contract claim but only after forcible detainer proceeding have

15  occurred causing her to be removed from her home.

16  39. Plaintiff will suffer irreparable harm if restraints are not granted pending

17  litigation against the Defendants' foreclosure proceedings/forcible detainer

18  proceedings which cannot be compensated by a bond.

19  40. Defendants have taken a position contrary to law and fact that they need not

20  suspend the foreclosure/eviction proceedings against the Plaintiff during the

21  pendency of Plaintiff's application for assistance under the Program.

22  41. As such, a dispute exists as to whether the Defendants are required to suspend

23  foreclosure/eviction proceedings against the Plaintiffs during the pendency of

24  the Plaintiffs application for assistance under the Program.

25  Wherefore as to Count Two, Plaintiff asks for the following relief:

26

-7-

A. For a temporary restraining order against Defendants suspending the foreclosure/forcible detainer proceedings now proceeding against the Plaintiff;

B. For a preliminary restraining order against the Defendants suspending the foreclosure proceedings/ forcible detainer proceedings against the Plaintiff pending final resolution of the Plaintiff's breach of contract claim;

C. For Declaratory relief and findings of fact and law that Plaintiff's application to the Program does suspend any foreclosure proceedings and as such the subsequent foreclosure that occurred in void as a matter of law and there exists no further basis for any legal proceeding consistent with foreclosure of the Plaintiff's interest in the real property.

D. For fees and costs incurred pursuant to A.R.S. § 12-341.01;

E. For other such relief at equity or law that the court finds reasonable.

Dated this 10 day of February 2010.

GIL SHAW, ATTORNEY & COUNSELOR AT LAW

By: _____

GIL SHAW, ATTORNEY & COUNSELOR AT LAW

105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

-8-

1

### VERIFICATION

2

I declare under penalty of perjury that I am the Plaintiff if the foregoing Complaint and

3  that the allegations and the statements contained in the foregoing Complaint are true and

4  correct  upon my best information and belief.

5                                                    Andrea Marks

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

-9-

GIL SHAW
Attorney & Counselor at Law
105 South Cortez
Second Floor
Prescott, Arizona 86303
928-443-9600
gshaw@peoplesrightslaw.com

Gil Shaw, SBN 009290
Attorney for Plaintiffs

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR YAVAPAI COUNTY

| | |
|---|---|
| ANDREA MARKS, a single woman, Plaintiff, Vs. BANK OF AMERICA a foreign corporation, FEDERAL NATIONAL MORTGAGE ASSOCIATION dba Fannie Mae, a Federally Chartered Corporation,BLACK CORPORATIONS 1-5, WHITE PARTNERSHIPS 1-5, JOHN DOES 1-5 AND JANE DOES 1-5, Defendants. | Case No. CV P1300 **P0 T0 0 0 2 3 5** <br><br> SUMMONS |

THE STATE OF ARIZONA TO:  ALL DEFENDANTS

   **YOU ARE HEREBY SUMMONED** and required to appear and defend, within the time applicable, in this action in this Court.  If served within Arizona, you shall appear and defend within **20 days** after the service of the Summons and Complaint upon you, exclusive of the day of service.  If served out of the State of Arizona – whether by direct service, by registered or certified mail, or by publication - you shall appear and defend within **30 days** after the service of the Summons and Complaint upon you is complete, exclusive of the day of service.  Service by registered or certified mail without the State of Arizona is complete **30 days** after the date of filing the receipt and affidavit of service with the Court.  Service by publication is complete 30 days after the date of first publication.  Direct service is complete when made.  Ariz. R. Civ. P. 4.

   **YOU ARE HEREBY NOTIFIED** that in order to appear and defend, you must

file a proper response in writing with the clerk of this Court, accompanied by the necessary filing fee, within the time required.  You are required to serve a copy of any response upon Plaintiff's attorney.  Ariz. R. Civ. P. 10(d); Ariz. Rev. Stat. § 12-311; Ariz. R. Civ. P. 5.

REQUESTS FOR REASONABLE ACCOMMODATION FOR PERSONS WITH DISABILITIES MUST BE MADE TO THE DIVISION ASSIGNED TO THE CASE BY PARTIES AT LEAST THREE (3) JUDICIAL DAYS IN ADVANCE OF A SCHEDULED COURT PROCEEDING.

The names and addresses of the Plaintiff's attorneys are:

> Gil Shaw, Attorney & Counselor at Law
> 105 South Cortez, Second Floor
> Prescott, Arizona  86303
> (928) 443-9600

A copy of the Summons, Complaint, and any and all other documentation filed and served may be obtained from the Clerk of the Superior Court, Yavapai County, at the Courthouse, 120 South Cortez, Prescott, Arizona  86303.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of Yavapai this 10th day of February, 2010.

CLERK OF THE SUPERIOR COURT

By _____
Deputy Clerk

GIL SHAW, ATTORNEY & COUNSELOR AT LAW
105 SOUTH CORTEZ, SECOND FLOOR
PRESCOTT, ARIZONA 86303
928-443-9600

-2-

ORIGINAL FILED THIS
DAY OF ___ FEB 1 0 2010
JEANNE HICKS
Clerk Superior Court
By ___ Shauna Kelbaugh
Deputy

1
2   GIL SHAW
    Attorney & Counselor at Law
3   105 South Cortez
    Second Floor
    Prescott, Arizona 86303
4   928-443-9600
    gshaw@peoplesrightslaw.com
5

6   Gil Shaw, SBN 009290
    Attorney for Plaintiffs

7   IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

8   IN AND FOR YAVAPAI COUNTY

9
    | ANDREA MARKS, a single woman, | Case No. CV P1300 2 0 1 0 0 0 0 2 3 5 |
10  | Plaintiff, | |
    | Vs. | |
11  | BANK OF AMERICA a foreign | |
12  | corporation, FEDERAL NATIONAL | CERTIFICATE OF COMPULSORY |
    | MORTGAGE ASSOCIATION dba | |
13  | Fannie Mae, a Federally Chartered | ARBITRATION |
    | Corporation, BLACK CORPORATIONS | |
14  | 1-5, WHITE PARTNERSHIPS 1-5, | |
15  | JOHN DOES 1-5 AND JANE DOES 1-5, | |
    | Defendants. | |
16

17      The undersigned agrees that pursuant to Rule 72(b)(1), Ariz. R. Civ. P., this matter

18  **is not** subject to compulsory arbitration because although the amounts sought do **NOT**

19  exceed the $65,000 limit set by Local Rule, other relief sought is injunctive and is not

20  subject to arbitration.

            Dated this _10_ day of February 2010.

21
            GIL SHAW, ATTORNEY & COUNSELOR AT LAW
22

23      By: _____

24

25

26